CHARLES W. STONE; MARIE STONE; MONA M. KEECH; MARK DEARMON; MASON
P. THOMAS, JR.; MARGARET KAY HOVIOUS; JEANNETTE M. DEAN; WILLIAM
R. FOSTER; R. ROSS HAILEY, JR.; THOMAS F. EAMON; FLINT BENSON;
DONNIE G. PERRY; W.R. McCLURE; AND MARY SINGLETON; ON BEHALF OF THEM-
SELVES AND ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS V. THE STATE OF NORTH
CAROLINA; MICHAEL F. EASLEY, IN HIS CAPACITY AS GOVERNOR OF NORTH CAROLINA;
ROBERT POWELL, IN HIS CAPACITY AS STATE CONTROLLER OF NORTH CAROLINA; DAVID
T. McCOY, IN HIS CAPACITY AS STATE BUDGET OFFICER OF NORTH CAROLINA; RICHARD
H. MOORE, IN HIS CAPACITY AS TREASURER OF NORTH CAROLINA; AND THE BOARD OF
TRUSTEES OF THE TEACHERS' AND STATE EMPLOYEES' RETIREMENT SYS-
TEM OF NORTH CAROLINA, A BODY POLITIC AND CORPORATE; DEFENDANTS

No. COA07-718

(Filed 5 August 2008)

**1. Governor; Pensions and Retirement— executive order—
state employees' retirement system—employer contribu-
tions escrowed—unconstitutionality**

An executive order signed by the governor directing that
state employers send the employer portion of retirement contri-
butions for the state employees' retirement system to the State
Controller for placement into an escrow account for the purpose
of ensuring a balanced state budget "diverted" the funds in viola-
tion of N.C. Const. art. V, § 6(2) even though the employer contri-
butions had not yet been received by the retirement system.

**2. Pensions and Retirement— state employees' retirement
system—actuarially sound funding—contractual right**

Vested state employees have a contractual right to have their
retirement systems funded in an actuarially sound manner.

**3. Pensions and Retirement— state employees' retirement
system—escrow of employer contributions—impairment of
contract**

The diversion of employer contributions from the state em-
ployees' retirement system into an escrow account pursuant to an
executive order signed by the governor impaired the contractual
rights of vested members to a retirement system funded in an
actuarially sound manner because, at the time the employer con-
tributions were escrowed, it was unclear when, or even whether,
the diverted funds would be repaid, and the integrity and security
of the retirement system were threatened.

STONE v. STATE

[191 N.C. App. 402 (2008)]

## 4. Pensions and Retirement— state employees' retirement system—escrow of employer contribution—not reasonable and necessary

The escrow of the employer contribution to the state employees' retirement system was not reasonable and necessary to serve the important public purpose of avoiding a constitutionally prohibited budget deficit and violated the contract clause of the U.S. Constitution. A balanced budget could have been achieved in another way. U.S. Const. art. I, § 10.

## 5. Pensions and Retirement— state employees' retirement system—employer contribution escrowed—no penalty

The trial court did not err by granting summary judgment for the State Treasurer and the board of trustees of the state employees' retirement system on a claim for a writ of mandamus to compel compliance with N.C.G.S. § 135-8(f)(3), which imposes a penalty when contributions to the state employees' retirement system are not received. The statute speaks in terms of default by an employer, but in the present case the employer contributions were escrowed as the result of an executive order. Moreover, the Treasurer and board of trustees had routinely waived the imposition of the fine when it was determined that there was no intent to not remit the contributions in a timely manner.

Appeal by Plaintiffs and Defendants from order entered 27 February 2007, incorporating by reference an order entered 6 September 2006, said orders entered by Judge Joseph R. John, Sr. in Superior Court, Wake County. Heard in the Court of Appeals 15 January 2008.

*Blanchard, Miller, Lewis & Styers, P.A., by E. Hardy Lewis and Karen M. Kemerait, for Plaintiffs.*

*Attorney General Roy Cooper, by Special Deputy Attorney General Alexander McC. Peters, Special Deputy Attorney General Joyce Rutledge, and Assistant Attorney General Robert M. Curran, for Defendants.*

*Thomas A. Harris for the State Employees Association of North Carolina, Inc., amicus curiae.*

McGEE, Judge.

The Governor of the State of North Carolina, Michael F. Easley (the Governor), signed Executive Order No. 3 on 8 February 2001. Executive Order No. 3 provided, in pertinent part:

[B]y the authority vested in me as Governor by Article III, Sec. 5(3) of the North Carolina Constitution to insure that a deficit is not incurred in the administration of the budget for fiscal year 2001, IT IS ORDERED:

. . . . .

The Office of the State Controller, as advised by the State Budget Officer, is directed to receive the employer portion of retirement contributions for all State funded retirement systems and to escrow such funds in a special reserve as established by [the Office of State Budget, Planning, and Management ("OSBPM")]. Before taking such action, OSBPM is directed to confirm with the State Treasurer that such action will not impair the actuarial integrity of the state retirement system. Return of all such receipts shall be made to the retirement system, if possible, after determination that such funds are not necessary to address the deficit.

In compliance with Executive Order No. 3, Edward Renfrow, the State Controller at the time, issued a memorandum on 15 February 2001 to all chief fiscal officers, vice chancellors, business managers, and local education authorities affiliated with employers participating in State-funded retirement systems. Specifically, he directed that all such employers send the funds allocated as employer contributions for the Teachers' and State Employees' Retirement System of North Carolina (the Retirement System) to an escrow account (the escrow account) in the Office of the State Controller.

Between February and June 2001, State employers sent $208,362,861.00 of Retirement System employer contributions to the escrow account. The Governor extended the terms of Executive Order No. 3 to include employer contributions for July and August 2001, and State employers sent an additional $16,511,854.00 of Retirement System employer contributions to the escrow account during that period of time. The amount of $16,511,854.00 was returned on 30 November 2001 to the Retirement System, and the amount of $82,612,901.00 was returned on 7 December 2001 to the Retirement System and to two other retirement systems from which

funds had been seized. The two other retirement systems were the Legislative Retirement System and the Judicial Retirement System. As of 31 December 2001, a total of $129,924,859.00 of Retirement System employer contributions that had been sent to the escrow account had not been repaid to the Retirement System.

Plaintiffs initiated this action on 14 June 2002 by filing a complaint for declaratory judgment and a petition for writ of mandamus. Plaintiffs alleged that the State of North Carolina; the Governor; Robert Powell, in his capacity as State Controller of North Carolina; and David T. McCoy, in his capacity as State Budget Officer of North Carolina, violated the Contract Clause of the United States Constitution; Article V, section 6(2) of the North Carolina Constitution; and Article I, sections 1 and 19 of the North Carolina Constitution. Plaintiffs also sought a writ of mandamus to require the Governor, Robert Powell, and David T. McCoy to permanently desist from the seizure and diversion of employer contributions, and to return to the Retirement System all funds that were appropriated, paid, seized, and diverted. Plaintiffs further sought a writ of mandamus to compel Richard H. Moore, in his capacity as Treasurer of North Carolina (the Treasurer), and the Board of Trustees (the Board) of the Retirement System to comply with N.C. Gen. Stat. § 135-8(f)(3).

Defendants filed a motion to dismiss Plaintiffs' complaint on 19 August 2002. Pursuant to Rule 2.1(a) of the General Rules of Practice, the Chief Justice of the North Carolina Supreme Court designated the case as exceptional and assigned the case to Emergency Judge Joseph R. John, Sr. Plaintiffs filed a first amended complaint for declaratory judgment, petition for writ of mandamus, and motion for class certification dated 12 February 2004.

The trial court entered an order certifying a class on 27 February 2004, and defined the class as follows: "[A]ll North Carolina teachers and State employees who were members of the Teachers' and State Employees' Retirement System of North Carolina, as provided in [N.C. Gen. Stat. §§] 135-3 and 135-4, at any time during the period 7 February 2001 to 7 August 2001, inclusive." The trial court also entered an order denying Defendants' motion to dismiss on 27 February 2004. Defendants filed an answer, dated 27 April 2004, to the first amended complaint.

Following substantial discovery, Plaintiffs and Defendants filed cross-motions for summary judgment on 20 February 2006. Plaintiffs subsequently filed a motion to amend their first amended complaint,

seeking to add a paragraph and amend an existing paragraph to add a claim under Article I, section 6 of the North Carolina Constitution. In their motion, Plaintiffs stated that Defendants did not object to Plaintiffs' motion to amend. The trial court entered an order on 26 July 2006 amending both Plaintiffs' first amended complaint and Defendants' answer to Plaintiffs' first amended complaint.

The trial court entered an order on the cross-motions for summary judgment on 6 September 2006, granting summary judgment for Plaintiffs on their "claim for declaratory judgment establishing that the actions of [D]efendants State of North Carolina, the Governor of North Carolina, the State Controller of North Carolina, and the State Budget Officer of North Carolina violate[d] Article V, Section 6 of the North Carolina Constitution[.]" Regarding Plaintiffs' claim for declaratory judgment that the actions of these Defendants violated the Contract Clause of the United States Constitution, the trial court ordered the following:

> [T]he Court will reserve ruling to allow the parties to determine whether sufficient stipulated facts can be provided to the Court to allow for ruling without a trial. Counsel are directed to report to the Court, within 15 days of the entry of this order, as to whether an additional hearing on this issue is necessary, and whether at such hearing the parties will put on evidence or submit stipulated facts.

The trial court also entered summary judgment for Defendants on Plaintiffs' remaining claims for declaratory judgment and on Plaintiffs' two remaining claims for writ of mandamus, one of which is the subject of Plaintiffs' appeal.

The parties filed a joint statement of stipulations regarding Plaintiffs' Contract Clause claim on 18 October 2006, and the trial court entered a final order on substantive claims on 27 February 2007. The trial court ordered: "The 6 September 2006 order is incorporated by reference in its entirety, such that the present order shall serve as the final judgment of the trial court in this case with regard to the substantive claims raised in the complaint[.]" The trial court also stated:

> 3. The Plaintiff Class has met its burden of proving the existence of a contract. The Plaintiff Class likewise has met its burden of proving that the State's actions impaired the contract.
>
> 4. With regard to the third prong, [D]efendants have met their burden of proving that the Governor's maintaining compliance

with his constitutional responsibility to ensure a balanced budget constitutes an important public purpose. However, [D]efendants have failed to carry their burden of proving that the diversion of employer contributions was "reasonable" or "necessary" in service of that purpose. In so ruling, the Court observes that the provisions for the 'inviolability' of retirement system funds contained in the Constitution of North Carolina indicate a public policy that would favor protection of these funds under the circumstances of the present case.

The trial court granted summary judgment for Plaintiffs on their Contract Clause claim. The trial court also certified the matter for immediate appeal:

Further, the Court finds that the instant case involves multiple parties and multiple claims, that the Court has entered final judgment as to certain claims and certain parties, that the Court has entered final judgment as to all substantive claims raised in the complaint, and that there is no just reason for delay of the parties' respective appeals; therefore, pursuant to N.C.G.S. [§] 1A-1, Rule 54(b), the Court certifies this matter for immediate appeal.

Plaintiffs appeal the grant of summary judgment to the Treasurer and to the Board on Plaintiffs' claim for writ of mandamus to compel compliance with N.C. Gen. Stat. § 135-8(f)(3). The grant of summary judgment to Plaintiffs on their claims for declaratory judgment under Article V, section 6(2) of the North Carolina Constitution and under the Contract Clause of the United States Constitution is appealed by the State of North Carolina; the Governor; Robert Powell; and David T. McCoy. For the reasons set forth herein, we affirm the orders of the trial court.

## Standard of Review

"It is well settled that de novo review is ordinarily appropriate in cases where constitutional rights are implicated." *Piedmont Triad Reg'l Water Auth. v. Sumner Hills, Inc.*, 353 N.C. 343, 348, 543 S.E.2d 844, 848 (2001). "We review a trial court's order for summary judgment de novo to determine whether there is a 'genuine issue of material fact' and whether either party is 'entitled to judgment as a matter of law.' " *Robins v. Town of Hillsborough*, 361 N.C. 193, 196, 639 S.E.2d 421, 423 (2007) (citations omitted). In reviewing a summary judgment order, we consider the evidence in the light most favorable to the nonmoving party. *Bruce-Terminix Co. v. Zurich Ins. Co.*, 130 N.C. App. 729, 733, 504 S.E.2d 574, 577 (1998).

STONE v. STATE

[191 N.C. App. 402 (2008)]

## Defendants' Appeal

### I.

[1] Defendants the State of North Carolina, the Governor, Robert Powell, and David T. McCoy argue the trial court erred by granting summary judgment for Plaintiffs on the ground that Executive Order No. 3 violated Article V, section 6(2) of the North Carolina Constitution. N.C. Const. art. V, § 6(2) provides:

> Neither the General Assembly nor any public officer, employee, or agency shall use or authorize to be used any part of the funds of the Teachers' and State Employees' Retirement System or the Local Governmental Employees' Retirement System for any purpose other than retirement system benefits and purposes, administrative expenses, and refunds; except that retirement system funds may be invested as authorized by law, subject to the investment limitation that the funds of the Teachers' and State Employees' Retirement System and the Local Governmental Employees' Retirement System shall not be applied, diverted, loaned to, or used by the State, any State agency, State officer, public officer, or public employee.

Defendants argue that the protections of Article V, section 6(2) of the North Carolina Constitution do not apply to their actions because the employer contributions at issue in the present case were not yet part of the funds of the Retirement System. Specifically, Defendants argue that

> no monies appropriated by the General Assembly for salaries and related expenses of employees are considered employer contributions to the Retirement System unless and until they are actually remitted to and received by the Retirement System, and only then are they placed in a Retirement System fund subject to the protections of Article V, § 6.

Plaintiffs counter that a violation of Article V, section 6(2) of the North Carolina Constitution occurs where "monies identified as employer contributions, and paid in the exact amounts and on the exact schedule required for employer contributions by the [Retirement] System, are diverted to another use before being deposited into the [Retirement] System[.]" Plaintiffs specifically focus on the language in Article V, section 6(2) that states that Retirement System funds shall not be "diverted."

We thus determine whether Defendants' actions "diverted" Retirement System funds in violation of Article V, section 6(2) of the North Carolina Constitution. "Issues concerning the proper construction of the Constitution of North Carolina 'are in the main governed by the same general principles which control in ascertaining the meaning of all written instruments.' " *State ex rel. Martin v. Preston,* 325 N.C. 438, 449, 385 S.E.2d 473, 478 (1989) (quoting *Perry v. Stancil,* 237 N.C. 442, 444, 75 S.E.2d 512, 514 (1953)). "In interpreting our Constitution—as in interpreting a statute—where the meaning is clear from the words used, we will not search for a meaning elsewhere." *Id.* at 449, 385 S.E.2d at 479.

The term "divert" is defined as follows: "To turn aside from a direction or course[.]" Webster's II New College Dictionary 339 (3d ed. 2005). In the present case, the funds at issue were intended for the Retirement System. However, in compliance with Executive Order No. 3, the State Controller ordered those funds to be deposited in the escrow account. State employers did as directed and, as the trial court found, the funds were used entirely "for purposes other than retirement system benefits and purposes, administrative expenses, and refunds." By these actions, Defendants turned the funds aside from their intended destination, which was the Retirement System.

Defendants argue that "the use of the word 'diverted' is consistent with the Constitution's protection against misuse of the funds which are in the possession of and controlled by the Treasurer." Therefore, Defendants argue, the North Carolina Constitution does not protect employer contributions not yet deposited in Retirement System accounts. However, Article V, section 6(2) of the North Carolina Constitution not only precludes retirement system funds from being "applied," "loaned to," or "used by" the State, but also precludes those funds from being "diverted" by the State. Even if the terms other than "diverted" apply only in the context of funds already held in Retirement System accounts, which we do not decide, "we follow the maxims of statutory construction that words of a statute are not to be deemed *useless or redundant*[.]" *Town of Pine Knoll Shores v. Evans,* 331 N.C. 361, 366, 416 S.E.2d 4, 7 (1992) (emphasis added). Therefore, we must give effect to the term "diverted." *See Preston,* 325 N.C. at 449, 385 S.E.2d at 478 (stating: " 'The will of the people as expressed in the Constitution is the supreme law of the land. In searching for this will or intent all cognate provisions are to be brought into view in their entirety and so interpreted as to effectuate the manifest purposes of the instrument. The best way to ascertain

the meaning of a word or sentence in the Constitution is to read it contextually and to compare it with other words and sentences with which it stands connected.' " (quoting *State v. Emery*, 224 N.C. 581, 583, 31 S.E.2d 858, 860 (1944) (citations omitted))). Applying the plain meaning of the term "diverted," we hold that the prohibition against seizure of the Retirement System's funds applies to, and includes, those funds appropriated and intended for the Retirement System, but not yet deposited therein. We thus hold that Defendants diverted assets of the Retirement System and, by doing so, Defendants violated Article V, section 6(2) of the North Carolina Constitution. Therefore, we hold the trial court did not err by granting Plaintiffs' motion for summary judgment.

II.

These Defendants also argue the trial court erred by granting summary judgment for Plaintiffs on the ground that Executive Order No. 3 violated the Contract Clause of the United States Constitution. The Contract Clause of the United States Constitution provides that "[n]o state shall . . . pass any . . . law impairing the obligation of contracts[.]" U.S. Const. art. I, § 10. In order to determine whether there has been a violation of the Contract Clause, a court must ascertain the following: "(1) whether a contractual obligation is present, (2) whether the state's actions impaired that contract, and (3) whether the impairment was reasonable and necessary to serve an important public purpose." *Bailey v. State of North Carolina*, 348 N.C. 130, 140-41, 500 S.E.2d 54, 60 (1998). We address these requirements in the following three subsections.

A.

[2] It is well settled, and Defendants do not contest, that a contractual relationship exists between vested State employees and the State's retirement systems, and that vested State employees have contractual rights to their retirement benefits. *See id.* at 150, 500 S.E.2d at 66 (holding that "the relationship between the Retirement Systems and employees vested in the system is contractual in nature, [and] the right to benefits exempt from state taxation is a term of such contract"); *Faulkenbury v. Teachers' and State Employees' Ret. Sys.*, 345 N.C. 683, 690, 483 S.E.2d 422, 427 (1997) (recognizing that vested state employees have contractual rights to disability benefits calculated pursuant to the method in place when they vested); *Simpson v. N.C. Local Gov't Employees' Retirement System*, 88 N.C. App. 218, 224, 363 S.E.2d 90, 94 (1987), *aff'd per curiam*, 323 N.C. 362, 372 S.E.2d 559 (1988) (holding that "members of the North Carolina Local

Governmental Employees' Retirement System[] ha[ve] a contractual right to rely on the terms of the retirement plan as these terms existed at the moment their retirement rights became vested").

Defendants argue, however, that Plaintiffs do not have a contractual right to a retirement system that is funded in an actuarially sound manner, as concluded by the trial court. Defendants also argue that "[P]laintiffs have neither alleged nor shown that they are not receiving the benefits to which they are entitled, nor can they show that their benefits have in any way been harmed or are in danger of being harmed by action taken pursuant to Executive Order No. 3."

In *Bailey*, our Supreme Court recognized that the determination that a contractual relationship exists does not end the inquiry; "[t]his Court must determine whether the tax exemption was a condition or term included in the retirement contract." *Bailey*, 348 N.C. at 146, 500 S.E.2d at 63; *see also Robertson v. Kulongoski*, 466 F.3d 1114, 1117 (9th Cir. 2006), *cert. denied*, 550 U.S. ——, 167 L. Ed. 2d 1092 (2007) (stating that " '[t]he first sub-inquiry is not whether any contractual relationship whatsoever exists between the parties, but whether there was a "contractual agreement *regarding the specific . . . terms allegedly at issue*" ' " (citations omitted)). In *Bailey*, our Supreme Court held that the trial court's finding that the plaintiffs had a contractual right to the tax exemption at issue was supported by evidence of

> creation of various statutory tax exemptions by the legislature, the location of those provisions alongside the other statutorily created benefit terms instead of within the general income tax code, the frequency of governmental contract making, communication of the exemption by governmental agents in both written and oral form, use of the exemption as inducement for employment, mandatory participation, reduction of periodic wages by contribution amount (evidencing compensation), loss of interest for those not vesting, establishment of a set time period for vesting, and the reliance of employees upon retirement compensation in exchange for their services. Thus, it is clear the tax exemption was a term or condition of benefits of the Retirement Systems to which [the] plaintiffs have a contractual right.

*Bailey*, 348 N.C. at 146, 500 S.E.2d at 63.

In the present case, our Court must determine whether, as a term of their contracts for retirement benefits, Plaintiffs were entitled to have the Retirement System funded in an actuarially sound manner.

An "actuarially sound retirement system" is defined as a "retirement plan that contains sufficient funds to pay future obligations, as by receiving contributions from employees and the employer to be invested in accounts to pay future benefits." Black's Law Dictionary 39 (8th ed. 2004).

We first examine the statutes in effect at the time of the diversion of the employer contributions. *See Wells v. Consolidated Jud'l Ret. Sys. of N.C.*, 136 N.C. App. 671, 673, 526 S.E.2d 486, 488-89 (2000), *aff'd*, 354 N.C. 313, 553 S.E.2d 877, *reh'g denied*, 354 N.C. 580, 559 S.E.2d 553 (2001) (stating that "[t]he [retirement] contract is embodied in state statute and governed by statutory provisions as they existed at the time the employee's contractual rights vested"). Specifically, we consider N.C. Gen. Stat. § 135-8(d)(1), which deals with the method of financing the Retirement System, and which provides as follows:

> On account of each member there shall be paid in the pension accumulation fund by employers an amount equal to a certain percentage of the actual compensation of each member to be known as the "normal contribution," and an additional amount equal to a percentage of his actual compensation to be known as the "accrued liability contribution." *The rate per centum of such contributions shall be fixed on the basis of the liabilities of the Retirement System as shown by actuarial valuation.*

N.C. Gen. Stat. § 135-8(d)(1) (2001) (emphasis added). An actuarial valuation is determined by an actuary, who is a "statistician who determines the present effects of future contingent events; esp., one who calculates insurance and pension rates on the basis of empirically based tables." Black's Law Dictionary 39 (8th ed. 2004). N.C. Gen. Stat. § 135-8(d)(3) (2001) provides, in pertinent part: "Upon certification by the actuary engaged by the Board of Trustees that the accrued liability contribution rate may be reduced without impairing the Retirement System, the Board of Trustees may cause the accrued liability contribution rate to be reduced." This statute demonstrates that contributions to the Retirement System can be reduced only if the State's actuary certifies that such a reduction will not impair the Retirement System. However, as we discuss in subsection B below, the State's actuary in the present case did not make such a certification.

We next consider N.C. Gen. Stat. § 135-6 (2001), which governs the administration of the Retirement System. N.C. Gen. Stat.

§ 135-6(g) (2001) requires the Board of Trustees to "engage such actuarial and other service as shall be required to transact the business of the Retirement System." N.C. Gen. Stat. § 135-6(h) (2001) also requires the following: "The Board of Trustees shall keep in convenient form such data as shall be necessary for actuarial valuation of the various funds of the Retirement System, and for checking the experience of the System." N.C. Gen. Stat. § 135-6(i) (2001) provides:

> The Board of Trustees shall keep a record of all of its proceedings which shall be open to public inspection. It shall publish annually a report showing the fiscal transactions of the Retirement System for the preceding year, the amount of the accumulated cash and securities of the System, and the last balance sheet showing the financial condition of the System by means of an actuarial valuation of the assets and liabilities of the Retirement System.

The following statutes, N.C. Gen. Stat. § 135-6(m)-(o) (2001), all envision an active role for an actuary in the Retirement System:

> (m) Immediately after the establishment of the Retirement System the actuary shall make such investigation of the mortality, service and compensation experience of the members of the System as he shall recommend and the Board of Trustees shall authorize, and on the basis of such investigation he shall recommend for adoption by the Board of Trustees such tables and such rates as are required in subsection (n), subdivisions (1) and (2), of this section. The Board of Trustees shall adopt tables and certify rates, and as soon as practicable thereafter the actuary shall make a valuation based on such tables and rates of the assets and liabilities of the funds created by this Chapter.

> (n) In 1943, and at least once in each five-year period thereafter, the actuary shall make an actuarial investigation into the mortality, service and compensation experience of the members and beneficiaries of the Retirement System, and shall make a valuation of the assets and liabilities of the funds of the System, and taking into account the result of such investigation and valuation, the Board of Trustees shall:

>> (1) Adopt for the Retirement System such mortality, service and other tables as shall be deemed necessary; and

>> (2) Certify the rates of contributions payable by the State of North Carolina on account of new entrants at various ages.

(o) On the basis of such tables and interest assumption rate as the Board of Trustees shall adopt, the actuary shall make an annual valuation of the assets and liabilities of the funds of the System created by this Chapter.

Upon review of these statutes, it is clear that Plaintiffs had a contractual right to the funding of the Retirement System in an actuarially sound manner. Therefore, we hold that the right to have the Retirement System funded in an actuarially sound manner is a term or condition included in Plaintiffs' retirement contracts. *See Bailey*, 348 N.C. at 146, 500 S.E.2d at 63 (holding that "the tax exemption was a term or condition of benefits of the Retirement Systems to which [the] plaintiffs have a contractual right").

Moreover, the record in this case, on which the trial court relied in granting summary judgment for Plaintiffs, contains several examples of representations made to Plaintiffs that demonstrate that Plaintiffs have a contractual right to have the Retirement System funded in an actuarially sound manner. A pamphlet in the record entitled, "1975 YOUR RETIREMENT SYSTEM—how it works," which was distributed to State employees, stated the following:

YOUR EMPLOYER'S CONTRIBUTIONS

> Your employer contributes the major part of the cost of the benefits.

> Your employer is currently contributing at the rate of 9.12% of all salaries subject to retirement deductions.

> Your employer contributes to your retirement until you retire, regardless of age. The contributions are based on actuarial calculations so that your benefits can be provided on a sound basis.

Similarly, a 1 July 1996 pamphlet in the record entitled, "Your Retirement Benefits" stated the following: "The State bases contributions on the calculations prepared by an actuary." The pamphlet further stated the following:

Funded Status

The Retirement System has been labeled as "actuarially sound" because of the consistent use over the years of:

[—] actuarial assumptions based on experience,

[—] an approved actuarial funding method, and

[—] the recognition of all promised benefits in the actuarial liabilities.

Our decision is further supported by numerous decisions of courts in other jurisdictions, which have held that vested state employees have a contractual right to have their retirement systems funded in an actuarially sound manner. *See Municipality of Anchorage v. Gallion*, 944 P.2d 436 (Alaska 1997); *Dadisman v. Moore*, 384 S.E.2d 816 (W. Va. 1989); *Valdes v. Cory*, 189 Cal. Rptr. 212 (Cal. Ct. App. 1983); *Sgaglione v. Levitt*, 337 N.E.2d 592 (N.Y. 1975); *Weaver v. Evans*, 495 P.2d 639 (Wash. 1972); *Dombrowski v. City of Philadelphia*, 245 A.2d 238 (Pa. 1968); *State Teachers' Retirement Board v. Giessel*, 106 N.W.2d 301 (Wis. 1960).

### B.

[3] These Defendants next argue that "even if a contractual right to an actuarially sound retirement system exists, there is no impairment of that contractual right if there is no impairment or diminishment of accrued, vested benefits." In support of their argument, Defendants rely upon *RPEC v. Charles*, 62 P.3d 470 (Wash. 2003), and *Halstead v. City of Flint*, 338 N.W.2d 903 (Mich. Ct. App. 1983). However, these cases are distinguishable.

In *RPEC*, the Washington Supreme Court held, as we do in the present case, that retirees and State employees did "have vested contractual rights to the systematic funding of the retirement system to maintain actuarial soundness." *RPEC*, 62 P.3d at 483. However, the Court also held that "there is no indication that the lowered [employer] contribution rates render the system actuarially unsound." *Id.* at 484. Consequently, the Court held that the "appellants have not met their burden of proof that a question of fact exists as to whether the system is actuarially unsound, i.e., the modifications made in EHB 2487 have not been shown to affect Retirees' and Employees' vested pension right." *Id.* Importantly, however, the State Actuary in *RPEC* had determined that the lowered employer contribution rates would not render the system actuarially unsound: "The stated reason for reducing the rates was that the 1998 valuation from the State Actuary determined that the funding goals expressed in former RCW 41.45.010 (1998) could still be met using lower contribution rates, primarily because of investment returns on the pension funds that were higher than anticipated." *Id.* at 476.

In contrast to *RPEC*, the record shows the State's actuary in the case before us, Edward A. Macdonald (Mr. Macdonald), stated the following in a 6 February 2001 letter to the Deputy Treasurer and Director of the Retirement Systems Division of the State Treasurer: "The employer rate cannot be reduced effective February 1, 2001 in an actuarially sound manner. . . . The System is not being funded in an actuarial[ly] sound manner since the actual contributions will be less than the annual required contributions." Mr. Macdonald also testified at a deposition as follows:

Q And have you since learning about the case formed any opinions concerning issues that have been raised in this lawsuit?

A I had opinions prior to the lawsuit being filed.

Q Can you tell me generally what those opinions are?

A That the escrowing of the money was not actuarially sound for the system. I believe I wrote at least one letter regarding that back probably three or four, probably three years ago.

Q Do you have any other opinions concerning the escrow of the money?

A That eventually it ought to be repaid. I mean, you know—

Q Will its having been repaid, assuming that happens, will its having been repaid change your opinion about whether the action in escrowing the money was actuarial[ly] sound?

A That action is actuarially unsound at that time, and repaying the money doesn't really change that.

Defendants, however, point to Mr. Macdonald's deposition testimony that his opinion regarding the actuarially unsound manner of funding the Retirement System "does not mean the system is actuarially unsound. It just means during that fiscal year the contribution that was made was not satisfactory of the fund, which should have been funded." Mr. Macdonald also testified that "maintaining an operating System in an actuarially unsound manner does not necessarily render the entire System actuarially unsound[.]"

The courts of other states have previously rejected arguments similar to the argument of Defendants. In *Dadisman*, the West Virginia Supreme Court cited *Valdes*, *Weaver*, and *Dombrowski* for the following proposition:

> Those cases found that even where a unilateral reduction in the state's share of pension contributions, as earned by State employees, does not result in out-of-pocket losses for plan participants, they still have a vested interest in the integrity and security of the funds available to pay future benefits. *See, e.g., Valdes,* 139 Cal. App. 3d at 785, 189 Cal. Rptr. 222. We agree with this reasoning.

*Dadisman,* 384 S.E.2d at 828. We also find this reasoning compelling. At the point in time when the employer contributions were escrowed in this case, the Retirement System was not being funded in an actuarially sound manner. At that time, it was unclear when, or even whether, the diverted funds would be repaid. Accordingly, the actuarially unsound diversion of funds threatened the integrity and security of the Retirement System. Therefore, we hold that by diverting the funds, Defendants' actions impaired the contractual right of Plaintiffs to a retirement system funded in an actuarially sound manner. *See Bailey,* 348 N.C. at 150-51, 500 S.E.2d at 66; *see also Public Employee Pensions in Times of Fiscal Distress,* 90 Harv. L. Rev. 992, 1006 (March 1977) (stating that "[o]n several occasions, governments have failed to continue the actuarial appropriations they had promised to make to the pension system, and courts have uniformly held these missed appropriations to be contract violations").

Defendants also rely upon *Halstead,* in which the Michigan Court of Appeals cited the Michigan State Constitution, which provided that "accrued financial benefits of the state's or a political subdivision's pension plan are a contractual obligation which cannot be diminished or impaired." *Halstead,* 338 N.W.2d at 905-06. The Michigan Court of Appeals also recognized that " '[a]ccrued financial benefits' have been defined as the right to receive certain pension payments upon retirement based on service performed." *Id.* at 906. However, the Court went further in holding that "[b]ecause there is no evidence that ordinance § 35-16.3 diminishes or impairs the full payment of [the] plaintiffs' accrued financial benefits, the ordinance does not violate the constitutional proscription against impairment of contracts." *Id. Halstead* is readily distinguishable from the present case because it presented the narrow issue of whether the legislative enactment violated the constitutional proscription against diminishing accrued financial benefits. In contrast, the issue in the case before us is whether Defendants' actions violated Plaintiffs' contractual right to a retirement system funded in an actuarially sound manner.

C.

[4] These Defendants also argue that even assuming Plaintiffs had a contractual right to a retirement system funded in an actuarially sound manner and that Defendants' actions impaired that contract, any impairment was reasonable and necessary to serve an important public purpose. Defendants contend that "it has been stipulated that the escrow of employer contributions mandated by Executive Order No. 3 was for the sole purpose of fulfilling the constitutional requirement to balance the State budget." Therefore, Defendants argue, the escrow of the employer contributions was reasonable and necessary to serve the important public purpose of avoiding a constitutionally prohibited budget deficit.

Article III, section 5(3) of the North Carolina Constitution provides:

The total expenditures of the State for the fiscal period covered by the budget shall not exceed the total of receipts during that fiscal period and the surplus remaining in the State Treasury at the beginning of the period. To insure that the State does not incur a deficit for any fiscal period, the Governor shall continually survey the collection of the revenue and shall effect the necessary economies in State expenditures[.]

N.C. Const. art. III, § 5(3). As our Court has recognized, "[t]his provision clearly places a duty upon the Governor to balance the budget and prevent a deficit." *County of Cabarrus v. Tolson*, 169 N.C. App. 636, 638, 610 S.E.2d 443, 445, *disc. review denied*, 359 N.C. 630, 616 S.E.2d 229 (2005).

We agree with the trial court and with Defendants that the avoidance of a constitutionally prohibited budget deficit is clearly an important public purpose. However, we also agree with the trial court that the escrow of the funds in the present case was not reasonable and necessary to achieve that purpose. As we recognized in our earlier discussion of Article V, section 6(2) of the North Carolina Constitution, retirement funds specifically receive special constitutional protection in North Carolina. Article V, section 6(2) of the North Carolina Constitution plainly provides that the State may not use retirement funds for any purpose other than "retirement system benefits and purposes, administrative expenses, and refunds[.]" N.C. Const. art. V, § 6(2). This constitutional provision demonstrates the strong public policy of North Carolina in favor of the inviolability of retirement funds. *See* John V. Orth, *The North Carolina State Constitution* 127 (1993) (stating: "By constitutional amendment,

approved in 1950 and carried forward into the 1971 Constitution, teachers and state employees secured constitutional protection for their retirement funds; in 1971 local government employees were given the same protection. *Money in the funds may not even be loaned to the state.*" (emphasis added)). Defendants argue that the constitutional protection of Retirement System funds extends only to those funds actually held by the Retirement System and that it is not against public policy to use funds not yet received by the Retirement System to balance the budget. Again, we reject this argument. As we held above, the escrow of the employer contributions was a diversion of Retirement System funds that was prohibited by the North Carolina Constitution.

Our Supreme Court in *Bailey* considered whether the impairment at issue in that case was reasonable and necessary to serve an important public purpose. *Bailey*, 348 N.C. at 151-53, 500 S.E.2d at 66-67. Our Supreme Court recognized:

> "In applying this standard, . . . complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake. A governmental entity can always find a use for extra money, especially when taxes do not have to be raised. If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all."

*Id.* at 151-52, 500 S.E.2d at 66 (quoting *United States Trust Co. v. New Jersey*, 431 U.S. 1, 25-26, 52 L. Ed. 2d 92, 112, *reh'g denied*, 431 U.S. 975, 53 L. Ed. 2d 1073 (1977)). Our Supreme Court thus held:

> While it is clear that the state interest in this case—complying with a Supreme Court ruling—was important, what is equally clear is that the method chosen was not necessary to achieve the state interest asserted. In *Davis*, the Supreme Court did not tell North Carolina that it was required to tax state and local employees; nor did it set forth any mandatory scheme of compliance. *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 103 L. Ed. 2d 891. The Court merely held that federal retirees had to be treated the same as state and local retirees. *Id.* There are numerous ways that the State could have achieved this goal without impairing the contractual obligations of [the] plaintiffs.

*Id.* at 152, 500 S.E.2d at 67.

As in *Bailey*, we cannot say in the case before us that "the method chosen" of diverting employer contributions to the Retirement System was "necessary to achieve the state interest asserted." *See id.* A balanced budget could have been achieved in another way without diverting Retirement System funds that have been afforded special constitutional protection.

Our Supreme Court further held in *Bailey* that

the method chosen was not reasonable under the circumstances. The legislature sought a "revenue neutral" approach to complying with the *Davis* decision, meaning that legislators would be faced with neither raising taxes nor cutting other programs in order to comply. However, this convenient approach impaired vested rights of current and future state and local retirees to whom the State had made promises of exemption in consideration of their many years of public service.

*Id.*

Similarly, in the present case, instead of seeking a tax increase or cuts in other State programs that did not enjoy special constitutional protection, Defendants diverted the employer contributions to the Retirement System. Our Court cannot say that this diversion, which impaired the contractual right of Plaintiffs to a retirement system funded in an actuarially sound manner, was reasonable.

For the reasons stated above, we hold that the trial court did not err by granting summary judgment to Plaintiffs regarding their claim for declaratory judgment under the Contract Clause. Because we affirm the judgment of the trial court for Plaintiffs on the merits of their declaratory judgment claims under Article V, section 6(2) of the North Carolina Constitution and under the Contract Clause of the United States Constitution, we need not address Plaintiffs' cross-assignments of error.

## Plaintiffs' Appeal

[5] Plaintiffs argue the trial court erred by granting summary judgment to the Treasurer and to the Board on Plaintiffs' claim for writ of mandamus to compel compliance with N.C. Gen. Stat. § 135-8(f)(3). N.C. Gen. Stat. § 135-8(f)(3) provides:

In the event the employee or employer contributions required under this section are not received by the date set by the Board of Trustees, the Board shall assess the employer with a penalty of 1% per month with a minimum penalty of twenty-five dollars

($25.00). If within 90 days after request therefor by the Board any employer shall not have provided the System with the records and other information required hereunder or if the full accrued amount of the contributions provided for under this section due from members employed by an employer or from an employer other than the State shall not have been received by the System from the chief fiscal officer of such employer within 30 days after the last due date as herein provided, then, notwithstanding anything herein or in the provisions of any other law to the contrary, upon notification by the Board to the State Treasurer as to the *default of such employer as herein provided,* any distributions which might otherwise be made to such employer from any funds of the State shall be withheld from such employer until notice from the Board to the State Treasurer that such employer is no longer in *default.*

N.C. Gen. Stat. § 135-8(f)(3) (2007) (emphases added). Based upon the first sentence of the statute, Plaintiffs argue that because the employer contributions diverted pursuant to Executive Order No. 3 were not "received" by the Retirement System when they were due, the Board should have assessed a one percent per month penalty to those employers. Plaintiffs further argue that pursuant to the second sentence of the statute, all State funds should have been withheld from employers whose employer contributions were not received by the Retirement System "within 30 days after the last due date as [therein] provided[.]" We disagree.

The statute speaks in terms of a default by an employer. The term "default" is defined as the "[f]ailure to perform a task or fulfill an obligation, esp. failure to meet a financial obligation." Webster's II New College Dictionary 301 (3d ed. 2005); *see also* Black's Law Dictionary 449 (8th ed. 2004) (defining "default" as "[t]he omission or failure to perform a legal or contractual duty; esp., the failure to pay a debt when due"). In the present case, the State employers did not default on their obligation to remit their employer contributions to the Retirement System. State employers calculated the amount of their employer contributions to the Retirement System, but then were ordered to pay those amounts into the escrow account. As the trial court found,

the fact that the employer contributions affected by Executive Order No. 3 were not received by the Retirement System was neither the result of the intent of any employers to withhold contributions nor of negligence on the part of any employers, but rather

was the result of an intervening executive order that employers were bound to follow unless and until directed otherwise by competent authority.

Moreover, as the trial court found,

[f]or several years prior to and following the issuance of Executive Order No. 3, the Department of State Treasurer had routinely waived the imposition of the 1% per month fine provided in N.C. Gen. Stat. § 135-8(f)(3) for employers from whom the System had not received required payments when due when the Department of State Treasurer determined, in its discretion, that the employer had demonstrated lack of intent to fail to remit the contributions in a timely manner.

N.C. Gen. Stat. § 135-6(f) (2007) provides: "The Board of Trustees shall also, from time to time, in its discretion, adopt rules and regulations to prevent injustices and inequalities which might otherwise arise in the administration of this Chapter." The Board's practice of waiving penalties under circumstances where employers were not at fault for failing to remit employer contributions to the Retirement System is entirely consistent with the Board's statutory discretion to adopt rules "to prevent injustices." Accordingly, for all the reasons stated above, the Treasurer and the Board were not required to punish those employers whose employer contributions were not deposited in the Retirement System. Therefore, we hold the trial court did not err by granting summary judgment to the Treasurer and to the Board on Plaintiffs' claim for writ of mandamus.

Affirmed.

Judges WYNN and CALABRIA concur.