W.D. GOLDSTON, JR., JAMES E. HARRINGTON, AND CITIZENS, TAXPAYERS, AND BOND-
HOLDERS SIMILARLY SITUATED, PLAINTIFFS v. STATE OF NORTH CAROLINA AND
MICHAEL F. EASLEY, GOVERNOR, INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY,
DEFENDANTS

No. COA08-754

(Filed 15 September 2009)

1. **Appeal and Error— appealability—de novo review of sum-
   mary judgment—stipulation—handling of public trust
   funds**

   Where review was *de novo*, there was no need to address
   plaintiffs' arguments concerning the trial court's rulings on its
   authority, its alleged inappropriate use of collateral estoppel, its
   findings of fact, or its conclusions of law. An argument concern-
   ing the exclusion of materials was without merit since the parties
   stipulated to the facts.

2. **Appeal and Error— appealability—de novo review of sum-
   mary judgment—stipulation—handling of public trust
   funds**

   In a declaratory judgment action arising from the transfer of
   money from the North Carolina Highway Trust Fund to the State's
   General Fund, plaintiffs' contention that fundamental principals
   of expending public money were violated was rejected. The Trust
   Fund lacked the indicia of a trust, the language creating the Trust
   Fund was ambiguous on whether it was intended to be a true
   trust, the Trust Fund was not entitled to the same level of consti-
   tutional protection that state employees' retirement funds enjoy,
   plaintiffs' interpretation would allow one General Assembly to
   bind future legislatures, and the General Assembly had deter-
   mined that one of the uses of the Trust Fund is to supplement the
   General Fund.

3. **Legislature— transfer of money from Highway Trust Fund
   to General Fund—waiver—mootness**

   Plaintiffs' argument that the General Assembly violated arti-
   cle V, section 5 of the North Carolina Constitution by diverting
   $125,000 from the North Carolina Highway Trust Fund to the
   General Fund was moot because the General Assembly reim-
   bursed the Trust Fund the entire amount diverted.

**4. Governor— improper transfer of money from Highway Trust Fund to General Fund—failure to wait for appropriate legislative authority**

The trial court erred in a declaratory judgment action by concluding that the transfer of $80,000 from the North Carolina Highway Trust Fund to the General Fund was not in violation of article III, section 5 of the North Carolina Constitution because the Governor may not transfer appropriated Trust Fund monies without appropriate legislative authority.

Judge McGEE concurring in result in part and dissenting in part.

Appeal by plaintiffs from judgment and order entered 27 March 2008 by Judge Joseph R. John, Sr., in Wake County Superior Court. Heard in the Court of Appeals 28 January 2009.

*Boyce & Isley, PLLC, by G. Eugene Boyce, R. Daniel Boyce and Philip R. Isley, for plaintiff appellants.*

*Attorney General Roy Cooper, by Special Deputy Attorney General Norma S. Harrell and Assistant Solicitor General John F. Maddrey, for defendant appellees.*

HUNTER, JR., Robert N., Judge.

Plaintiffs request a declaratory judgment asking whether the transfer to the General Fund of $80,000,000 by the Governor and $125,000,000 by statute from funds appropriated in 2001 to the North Carolina Highway Trust Fund ("Trust Fund") were contrary to provisions of the North Carolina Constitution dealing with public funds, specifically N.C. Const. art. III, § 5(3) and N.C. Const. art. V, § 5. On cross motions for summary judgment, the trial court held both transfers to be lawful. We affirm in part the trial court with regard to the statutory transfer of $125,000,000 but reverse with regard to the Governor's transfer of $80,000,000. As to the other matters raised in the appeal, we affirm the trial court, as discussed herein.

# IN THE COURT OF APPEALS

## I.

### A. Legislative History[1]

The General Assembly created the North Carolina Highway Trust Fund ("Trust Fund") in 1989, establishing a special account within the State. Treasury to provide multi-year funding for highway construction and maintenance. 1989 N.C. Sess. Laws ch. 1933-97. The Trust Fund receives monies flowing from several revenue streams, including motor vehicle title and registration fees; motor fuels excise taxes; alternative fuels excise taxes; motor vehicle use taxes; and interest and income earned by the Trust Fund. As originally enacted, Trust Fund revenues were to be used only for specified projects of the Intrastate Highway System, for specific urban loop highways, and to provide supplemental appropriations for specific secondary roads and for city streets, with a small portion of the Trust Fund allotted for administrative expenses.

In addition, the 1989 statute creating the Trust Fund directed that a portion of the funds be transferred each year from the Trust Fund to the State's General Fund. *Id.* at 1982-83. As originally enacted, N.C. Gen. Stat. § 105-187.9 (2007) stated: "In each fiscal year the State Treasurer shall transfer the sum of . . . ($170,000,000) of the taxes deposited in the Trust Fund to the General Fund[.]"[2] This transfer has been made in each succeeding fiscal year, though the amount transferred each year varied in accordance with fluctuations in motor vehicle use tax collections as required by N.C. Gen. Stat. § 105-187.9(b)(2) and in response to loans made from and payments made to the Trust Fund by the Legislature. In 1989, $279,400,000 was transferred to the General Fund. 1989 N.C. Sess. Laws ch. 1983-84.

On 21 September 2001, in the 2001 N.C. Sess. Laws ch. 424, the "Current Operations and Capital Improvements Appropriations Act of

---

1. The facts and procedural history are substantially the same as cited by the Supreme Court in *Goldston v. State*, 361 N.C. 26, 637 S.E.2d 876 (2006) but have been supplemented to add facts relevant to the consideration of issues broader than "standing."

2. N.C. Gen. Stat. § 105-187.9, states:

(2) In addition to the amount transferred under subdivision (1) [the $170,000,000] of this subsection, the sum of one million seven hundred thousand dollars ($1,700,000) shall be transferred in the 2001-2002 fiscal year. The amount distributed under this subdivision shall increase in the 2002-2003 fiscal year to the sum of two million four hundred thousand dollars ($2,400,000). In each fiscal year thereafter, the sum transferred under this subdivision shall be the amount distributed in the previous fiscal year plus or minus a percentage of this sum equal to the percentage by which tax collections under this Article increased or decreased for the most recent 12-month period for which data are available.

2001" ("Appropriations Act of 2001", or "Act") was read three times in the General Assembly and ratified. 2001 N.C. Sess. Laws ch. 424. Subsequently, the Act was signed into law by Governor Easley at 11:15 a.m. on 26 September 2001. *Id.* The Act set spending for the 2001-2003 biennial fiscal years. The Act amended section 105-187.9 so as to continue the yearly transfer of $170,000,000 from the Trust Fund to the General Fund: in the 2001-2002 fiscal year, the sum of $1,700,000; in the 2002-2003 fiscal year, the sum of $2,400,000.

In each fiscal year thereafter, the sum transferred under this subdivision shall be the amount distributed in the previous fiscal year plus or minus a percentage of this sum equal to the percentage by which tax collections under this article increased or decreased for the most recent 12-month period for which data are available.

N.C. Gen. Stat. § 105-187.9(b)(2).

Approximately four months after the passage of the Act, on 5 February 2002, the Governor issued Executive Order 19 ("Executive Order 19" or "Order"). The Order recites that a " 'deficit' is defined as having been incurred when total expenditures for the fiscal period of the budget exceed the total of receipts during the period, plus the surplus remaining in the State Treasury at the beginning of the period." Exec. Order No. 19, 16 N.C. Reg. 1866 (Mar. 1, 2002). The fiscal period began 1 July 2001. *Id.*

The Order includes nine sections affecting the expenditure of funds collected by the State. Section 5 and section 9 are relevant to our analysis. Section 5 of Executive Order 19 states, "[The Office of State Budget and Management] may transfer, as necessary, funds from the Highway Trust Fund Account for support of General Fund appropriation expenditures." Exec. Order No. 19, 16 N.C. Reg. 1866 (Mar. 1, 2002). Accordingly, on 8 February 2002, the State Budget Officer directed that $80,000,000 be debited from the Trust Fund and credited to the General Fund.

Section 9 of Executive Order 19 reads as follows:

The Office of the State Controller, as advised by the State Budget Officer, is directed to receive the local government reimbursement funds and to escrow such funds in a special reserve as established by [the Office of State Budget Management]. Return of all such receipts shall be made to the local government reim-

bursement funds, if possible, after determination that such funds are not necessary to address the deficit.

Exec. Order No. 19, 16 N.C. Reg. 1866 (Mar. 1, 2002).

Subsequent to Executive Order 19, the General Assembly convened in Extra Session on 14 May 2002 and convened for the continuing Regular Session on 28 May 2002. An examination of the Session Laws passed by the General Assembly during these sessions reveals that the Legislature modified two provisions of the Act which concerned provisions of the Order. In the 2001 Regular Session, the Legislature abolished local government reimbursement statutes effective as of 1 July 2003. 2001 N.C. Sess. Laws chs. 2105-06. At the 14 May 2002 Session, the Legislature changed the effective date for repealing the local government reimbursement statutes from 1 July 2003 to 1 July 2002. 2002 N.C. Sess. Laws ch 503. The General Assembly also made appropriations from the Trust Fund for road construction; however, unlike the local reimbursement act appropriation, the Governor's transfer of $80,000,000 from the Trust Fund to the General Fund was not addressed by the Legislature. 2002 N.C. Sess. Laws ch. 302.

Because the State budget deficit continued for the 2002-2003 fiscal year, the General Assembly transferred $125,000,000 from the Trust Fund to the General Fund, effective 1 July 2002, in addition to the previously appropriated $170,000,000. 2002 N.C. Sess. Laws chs. 298-99. The General Assembly treated this transfer as a loan from the Trust Fund to the General Fund, committing to return the $125,000,000, including interest, to the Trust Fund during fiscal years 2004-2005 through 2008-2009. *Id.* at 298-99, 457. Subsequently, in fiscal year 2004-2005, the General Assembly reduced the yearly transfer of funds from the Trust Fund to the General Fund by $10,000,000 as a payment on this loan, *see* 2002 N.C. Sess. Laws ch. 457, and forgave the remainder of the loan in fiscal year 2005-2006. 2005 N.C. Sess. Laws ch. 674. In fiscal year 2006-2007, however, the General Assembly paid the remainder of the loan by again reducing the yearly transfer of funds from the Trust Fund to the General Fund by $115,000,000. 2006 N.C. Sess. Laws ch. 1523.

### B. Procedural History

On 14 November 2002, plaintiffs Goldston and Harrington, as North Carolina citizens and taxpayers, brought suit against the State and Governor. Plaintiffs alleged the transfers of $80,000,000 by the Governor and $125,000,000 by the General Assembly from the

Trust Fund to the General Fund were unlawful diversions of Trust Fund assets because disbursement of those funds is not allowed for any projects other than those specified by statute. The pertinent statute states that the "special objects" of the Trust Fund are the intrastate highways, urban loops, city streets, secondary roads, debt service, and Department of Transportation administrative expenses. N.C. Gen. Stat. § 136-176(b) (2007). Plaintiffs also contended these transfers violated the North Carolina Constitution, which mandates that "[e]very act of the General Assembly levying a tax shall state the special object to which it is to be applied, and it shall be applied to no other purpose." N.C. Const. art. V, § 5. Plaintiffs asserted that the statutorily defined "special objects" of the Trust Fund preclude use of Trust Fund assets for General Fund expenditures. Finally, plaintiffs alleged the Governor exceeded his constitutional authority under article III, section 5(3). This provision requires the Governor to administer the budget and "[t]o insure that the State does not incur a deficit for any fiscal period," but does not, plaintiffs contended, authorize the Governor to order transfers from the Trust Fund to the General Fund because the Trust Fund is separate from the General Fund and the annual budget process. N.C. Const. art. III, § 5(3).

Filing suit both as individual taxpayers and on behalf of other citizens similarly situated, plaintiffs alleged they were injured because they had paid motor fuel taxes, title and registration fees, and other highway taxes, which by law were collected expressly for application to the Trust Fund but had been diverted for other uses. They argued defendants' actions constituted both a current and future threat of illegal and unconstitutional depletion of Trust Fund assets.

Plaintiffs requested injunctive and declaratory relief, seeking both a declaration that defendants' actions were illegal and unconstitutional, and an immediate return of the monies at issue to the Trust Fund. Plaintiffs later abandoned their prayer for relief in the nature of mandamus through which they had requested return of the funds, but they continued to maintain that they faced the threat of future illegal and unconstitutional disbursements from the Trust Fund. In response, the State and the Governor filed a motion to dismiss, arguing that plaintiffs lacked standing "in that they have failed to allege the necessary facts to bring this suit: based on their status as citizens or taxpayers or bondholders; based on any alleged contractual or impairment claim; or on any other basis establishing their right to bring such claim against defendants." Defendants also claimed that

plaintiffs failed to state a claim for relief. Plaintiffs and defendants both filed motions for summary judgment.

In an order entered 29 January 2004, the trial court granted summary judgment in defendants' favor. Plaintiffs appealed to this Court which held the "dispositive" issue in the appeal was "whether the plaintiffs have standing." This Court initially held plaintiffs lacked standing to bring this action and so holding determined it was "unnecessary . . . to address the remaining issues briefed by the parties." *Goldston v. State*, 173 N.C. App. 416, 422, 618 S.E.2d 785, 790 (2005) (*Goldston I*). Subsequently, the Supreme Court reversed the decision of this Court, held plaintiffs had standing, and remanded the case to the Court of Appeals for further remand to the trial court. *Goldston v. State*, 361 N.C. 26, 637 S.E.2d 876 (2006) (*Goldston I*).

Upon remand, plaintiffs and defendants both renewed their cross motions for summary judgment. By order filed 27 March 2008, the trial court "reaffirmed" its prior grant of summary judgment to defendants and held that "[a]s a matter of law, Defendants did not violate the provisions of the North Carolina Constitution or act unlawfully in any way complained of by the Plaintiffs." The trial court furthermore held: "Plaintiffs are not entitled to re-litigate the previously entered Judgment for Defendants that was on the merits and that has never been vacated, [or] reversed" by an appellate court. From this decision, plaintiffs timely appeal.

### C. Jurisdiction

In *Goldston I*, only the issue of plaintiffs' standing was resolved by the Supreme Court. In that case, plaintiffs sought review of all the issues raised in their subsequent appeal, *i.e.*, the present appeal. In North Carolina courts, the law of the case applies only to issues that were decided in the former proceeding, whether explicitly or by necessary implication, but not to questions which might have been decided but were not. "[T]he doctrine of the law of the case contemplates only such points as are actually presented and necessarily involved in determining the case." *Hayes v. Wilmington*, 243 N.C. 525, 536, 91 S.E.2d 673, 682 (1956). Therefore, this Court has jurisdiction to address the issues not resolved but presented in plaintiffs' initial appeal.

### D. Standard of Review

In their briefs, both parties agree that the issues to be determined are matters of law. Both parties also agree that the standard of review

for these matters is de novo. "It is well settled that de novo review is ordinarily appropriate in cases where constitutional rights are implicated." *Piedmont Triad Reg'l Water Auth. v. Sumner Hills, Inc.*, 353 N.C. 343, 348, 543 S.E.2d 844, 848 (2001).

## II.

**[1]** Because we review questions of law de novo, we give no deference to the trial court's rulings on its own limits of judicial authority, its alleged inappropriate use of collateral estoppel, its findings of fact, or its conclusions of law. Our de novo review is to determine " 'whether, on the basis of the materials presented to the trial court, (1) there is a genuine issue of material fact and, (2) whether the movant is entitled to judgment as a matter of law.' " *21st Mortage Corp. v. Douglas Home Ctr., Inc.*, 187 N.C. App. 770, 773, 655 S.E.2d 423, 425 (2007) (citation omitted). Therefore there is no need to address plaintiffs' first, second, third, and seventh arguments.

Our review of "materials presented to the court" necessarily involves a review of matters plaintiffs submitted for judicial notice, which includes documents published by the North Carolina Legislature's Fiscal Research Division and certain newspaper articles. These are materials the trial court failed to consider on remand. Under N.C. Gen. Stat. § 8C-1, Rule 201(f) (2007), judicial notice may be taken at any stage of the proceedings. Section (c) allows a court to take judicial notice whether requested or not. N.C.G.S. § 8C-1, Rule 201(c). To the extent these materials submitted to the trial court contain adjudicated facts and refer to statutes, we have considered these materials in our review. Since the parties stipulated to the facts, however, and the issues under review are jointly recognized to be matters of law, it is unclear that plaintiffs were prejudiced by the exclusion of the materials sought to be included at the trial court level. Therefore, we conclude plaintiffs' sixth argument appealing the exclusion of these materials is without merit.

**[2]** Plaintiffs' fifth argument concerns handling of public "trust" funds. Plaintiffs contend that "[d]efendants violated fundamental principles of expenditures of public money held in [the] trust fund." Plaintiffs argue that because the Trust Fund is labeled a "trust fund," North Carolina law prohibits use of money held in this trust fund for any purposes other than those authorized when the trust was formed. Plaintiffs state: "[T]here can be no doubt that North Carolina's General Assembly meant to protect highway use taxes collected for ·

specific purposes from being diverted to expenditures other than those specified by the Highway Trust Fund Act." Specifically, according to plaintiffs, these funds are restricted by trust for the sole purpose of funding the "intrastate highway system, urban loops around seven major North Carolina cities, city streets and secondary roads." Plaintiffs add: "There is no doubt that the legislature, by labeling this 'account' a 'trust fund' had every intention of protecting the money from 'raids' or 'diversions' " for other purposes.

In addition plaintiffs, by analogy, argue that the "special object" language of article V, section 5 of the N.C. Constitution would protect appropriations of Trust Funds in the same manner that article V, section 6(2) protects Teachers' and State Employees' Retirement System Trust Funds. These arguments are not persuasive on several grounds.

First, the Trust Fund lacks the indicia of a trust. In creating a trust, a settlor deposits funds "in trust" to a trustee for the benefit of a third party, the beneficiary. The trustee is granted limited discretionary powers over the spending of the funds and is subject to an accounting and fiduciary duties. The legal relationships here lack these elements.

Second, the language creating the Trust Fund is ambiguous concerning whether the Trust Fund was intended to be a "true" trust fund. N.C. Gen. Stat. § 136-176 (2007) states: "Creation, revenue sources, and purpose of North Carolina Highway Trust Fund[:] (a) A special account, designated the North Carolina Highway Trust Fund, is created within the State treasury." This language merely states that a "special account . . . is created within the State treasury[,]" not a trust fund.

Third, the Trust Fund is not constitutionally protected in the same manner as the Teachers' and State Employees' Retirement System. The State is correct that article V, section 6(2) is explicit in its protection of retirement funds in that such funds cannot be used for any other purpose or be applied, diverted, loaned to, or used, by the State or any of its officers or agencies. As the State correctly notes, this Court in *Stone v. State*, 191 N.C. App. 402, 664 S.E.2d 32 (2008), held that the Governor was not able under article III, section 5 to escrow the Retirement System employer contributions to meet budget shortfall projections. Clearly, other sections of the Constitution governing specific procedures in the handling of public funds bind the Governor's powers under article III, section 5. The Trust

Fund is not entitled to this same explicit level of constitutional protection that State employees' retirement funds enjoy. Plaintiffs' analogy is not persuasive.

Fourth, the interpretation plaintiffs urge would allow one General Assembly to bind future Legislatures' handling of revenues. One General Assembly traditionally cannot bind another. *Kornegay v. Goldsboro*, 180 N.C. 441, 451, 105 S.E. 187, 192 (1920); *R. R. v. Oates*, 164 N.C. 167, 170, 80 S.E. 398, 399 (1913). Section 105-187.9 evinces the intention of the General Assembly to use part of the Trust Fund money to supplement the General Fund. Similar legislation mandating the transfer of certain Trust Fund money to the General Fund was enacted in the same session that created the Trust Fund. 1989 N.C. Sess. Laws chs. 1934-41, 1979-83. Like all appropriation statutes, the shifting of funds from one year to the next may be changed by the Legislature.

Even assuming *arguendo* that the Trust Fund is a true "trust fund," the General Assembly has determined that one of the "objects" of the Trust Fund is to supplement the General Fund. Use of the Trust Fund monies for this purpose thus cannot be viewed as a "raid" of the Trust Fund for purposes not previously sanctioned by the General Assembly. Consequently, we deny plaintiffs' appeal on its "trust fund" argument.

### III.

[3] Plaintiffs allege in their complaint that the General Assembly violated article V, section 5 of our Constitution by diverting $125,000,000 from the Trust Fund to the General Fund on 1 July 2002. Statutorily this is an accurate statement. An examination of the appropriations statutes following this "diversion," however, reveals that the General Assembly has reimbursed or paid back to the Trust Fund the $125,000,000 diverted in 2001. Plaintiffs attempted to illustrate this payment history or "forgiveness" in their motions for judicial notice, which included material from the Legislative Research Division containing statutory citations to appropriations acts. An examination of these and subsequent statutes shows that after the balance of the $125,000,000 loan was "forgiven" in fiscal year 2005-2006, 2005 N.C. Sess. Laws ch. 674, the Legislature repaid the balance of the loan in full in fiscal year 2006-2007, 2006 N.C. Sess. Laws ch. 1523.

This payment history in all probability led plaintiffs not to specifically reference the General Assembly in any of their assignments of error. Plaintiffs do not argue in their brief to this Court that the

GOLDSTON v. STATE

[199 N.C. App. 618 (2009)]

General Assembly violated any provisions of the North Carolina Constitution. Plaintiffs have thus failed to preserve this argument for appellate review. N.C. R. App. P. 28(a)-(b)(6) ("Assignments of error not set out in the appellant's brief, or in support of which no reason or argument is stated or authority cited, will be taken as abandoned."); *Jay Group, Ltd. v. Glasgow*, 139 N.C. App. 595, 602, 534 S.E.2d 233, 237-38, *disc. review denied*, 353 N.C. 265, 546 S.E.2d 100 (2000). Because the funds have been repaid, and the claim is moot, we affirm the trial court's summary judgment order as to the $125,000,000. There is no need for remand, and we do not further address this claim.

IV.

[4] The dispositive issue in this appeal is determining the meaning of the phrase "effect the necessary economies" as contained in N.C. Const. art. III, § 5(3), and how this end was accomplished by the transfer of $80,000,000 from the Trust Fund to the General Fund.

Article III, section 5 requires that the Governor "shall effect the necessary economies in State expenditures." In order for the Governor to exercise his powers to "effect the necessary economies," he must survey revenue collections to avoid a deficit in the State budget which occurs whenever he "determines that receipts during the fiscal period, when added to any surplus remaining in the State Treasury at the beginning of the period, will not be sufficient to meet budgeted expenditures." N.C. Const. art. III, § 5(3). The deficit which the Governor is to prevent is also defined in article III, section 5(3) as being present when "[t]he *total expenditures* for the State for the fiscal period covered by the budget shall not exceed the *total of receipts* during that fiscal period and the surplus remaining in the State Treasury at the beginning of the period." *Id.* (emphasis added).

Article III, section 5(3) has been the subject of two prior opinions of this Court and one advisory opinion of the Supreme Court. *Stone,* —— N.C. App. at ——, 664 S.E.2d at 32; *County of Cabarrus v. Tolson,* 169 N.C. App. 636, 610 S.E.2d 443 (2005); *Advisory Opinion In re Separation of Powers,* 305 N.C. 767, 295 S.E.2d 589 (1982). These decisions necessarily inform our decision in this case on the meaning of the phrase "effect the necessary economies."

In *In re Separation of Powers*, the North Carolina Supreme Court explained the constitutional process by which public funds are handled:

Our Constitution mandates a three-step process with respect to the State's budget. (1) Article III, Section 5(3) directs that the "Governor shall prepare and recommend to the General Assembly a comprehensive budget . . . for the ensuing fiscal period." (2) Article II vests in the General Assembly the power to enact a budget [one recommended by the Governor or one of its own making]. (3) After the General Assembly *enacts* a budget, Article III, Section 5(3) then provides that the Governor shall administer the budget "as enacted by the General Assembly."

305 N.C. at 776, 295 S.E.2d at 594 (quoting N.C. Const. art. III, § 5(3)).

The Governor's duty to administer the budget "as enacted by the General Assembly" under article III, section 5 equates with article V, section 7 and article III, section 5(4) of this State's Constitution. Article III, section 5(4) requires that the Governor take care that the laws be faithfully executed. The Governor as head of the executive department is charged with the duty of seeing that legislative acts are carried into effect. *Winslow v. Morton*, 118 N.C. 486, 489-90, 24 S.E. 417, 418 (1896). Article V, section 7 requires that "[n]o money shall be drawn from the State treasury but in consequence of appropriations made by law[.]" Subsection 1 of this section means that there must be legislative authority in order for money to be validly drawn from the treasury. In other words, the legislative power is supreme over the public purse. *White v. Hill*, 125 N.C. 194, 200, 34 S.E. 432, 433 (1899) (citing *Garner v. Worth*, 122 N.C. 250, 252, 29 S.E. 364, 365 (1898)) (decided under former article XIV, section 3); *accord State v. Davis*, 270 N.C. 1, 14, 153 S.E.2d 749, 758, *cert. denied*, 389 U.S. 828, 19 L. Ed. 24, 84 (1967).

These supporting cases were decided at a time in our history before enactment of present article III, section 5; however, they inform our decision here because they represent settled law as to the understanding of the legislative power under this State's Constitution with regard to its power to appropriate and the duty of the Governor to execute the laws. N.C. Const. art. III, § 5.

The construction of the term "effect the necessary economies" is an ambiguous term, requiring judicial construction. *Young v. Whitehall Co.*, 229 N.C. 360, 367, 49 S.E.2d 797, 801 (1948); *Milk Commission v. Food Stores*, 270 N.C. 323, 332, 154 S.E.2d 548, 555 (1967) ("[I]ntent must be found from the language of the act, its legislative history, and the circumstances surrounding its adoption[.]"); *Ingram v. Johnson, Comr. of Revenue*, 260 N.C. 697, 699, 133 S.E.2d

662, 664 (1963) ("[I]t is proper to look to legislative history, judicial interpretation of prior statutes dealing with the question, and the changes, if any, made following a particular interpretation."). When "interpreting our Constitution—as in interpreting a statute—where the meaning is clear from the words used, we will not search for a meaning elsewhere." *State, ex rel. Martin v. Preston*, 325 N.C. 438, 449, 385 S.E.2d 473, 478-79 (1989). Additionally, the Supreme Court emphasized that "[a]ll power which is not expressly limited by the people in our State Constitution remains with the people, and an act of the people through their representatives in the legislature is valid unless prohibited by that Constitution." *Id.* at 448-49, 385 S.E.2d at 478 (citing *McIntyre v. Clarkson*, 254 N.C. 510, 515, 119 S.E.2d 888, 891 (1961)).

Prior to 1925, when the State enacted the Executive Budget Act, N.C. Gen. Stat. §§ 143-1 through -34.9, the General Assembly prepared and adopted the State budget, which the Governor and agencies administered. STEPHENS N. DENNIS, RECENT CHANGES IN THE APPROPRIATIONS PROCESS, POPULAR GOVERNMENT, Institute of Government (1975). Subsequently, in 1968 in rewriting article III, section 5(3), the Governor's budgetary duties were given "constitutional status. The Governor's 'present' statutory duty for preparing and recommending the state budget to the General Assembly and then for administering it after enactment became a constitutional responsibility[.]" N.C. STATE CONST. STUDY COMM'N, REPORT OF THE N.C. STATE CONST. STUDY COMM'N 31 (1968). The present language of article III, section 5 was adopted in 1977. Article III, section 5 of the North Carolina Constitution, "Duties of Governor[,]" in relevant part states:

Budget. The Governor shall prepare and recommend to the General Assembly a comprehensive budget of the anticipated revenue and proposed expenditures of the State for the ensuing fiscal period. The budget as enacted by the General Assembly shall be administered by the Governor.

The total expenditures of the State for the fiscal period covered by the budget shall not exceed the total of receipts during that fiscal period and the surplus remaining in the State Treasury at the beginning of the period. To insure that the State does not incur a deficit for any fiscal period, the Governor shall continually survey the collection of the revenue and *shall effect the necessary economies in State expenditures,* after first making adequate provision for the prompt payment of the principal of

and interest on bonds and notes of the State according to their terms, whenever he determines that receipts during the fiscal period, when added to any surplus remaining in the State Treasury at the beginning of the period, will not be sufficient to meet budgeted expenditures.

N.C. Const. art. III, § 5(3) (emphasis added).

This language requires the Governor to recommend a "comprehensive" budget, although the Legislature is not required to adopt the budget as recommended. The Governor has a continuing duty, however, to administer whatever budget is adopted by the Legislature; this is a specific application of the Governor's duty to execute the laws. JOHN V. ORTH, THE NORTH CAROLINA STATE CONSTITUTION WITH HISTORY AND COMMENTARY 96 (University of North Carolina Press 1995).

During the time the 1977 amendment was adopted and until the passage of the Separation of Powers Act in 1983, the determinations of budget reductions and transfers between budgets were handled jointly by the Governor and the "Advisory Budget Commission" ("ABC"). 1983 N.C. Sess. Laws chs. 735-46. This joint "executive-legislative" administration of the budget was altered legislatively following the decisions in *Wallace v. Bone*, 304 N.C. 591, 286 S.E.2d 79 (1982) and *In re Separation of Powers*, 305 N.C. 767, 295 S.E.2d 589.

This brief period both before and after enactment of the 1977 constitutional amendment informs our consideration of what acts the drafters of the amendment considered to be "effect[ing] the necessary economies." Because prior budget acts were jointly administered by the Legislative and Executive branches, one cannot conclude that the Legislature, in enacting the 1977 amendments, intended to give the Governor appropriation power to redirect spending absent some explicit legislative concurrence. Had the Legislature intended to allow the Governor to redraw the Appropriations Acts wholesale, the Legislature would have provided an explicit provision for such a change.

Viewing the Constitution textually, this interpretation makes functional and operational sense because it separates the powers of appropriation between two of the branches of government. The Governor may veto budgetary acts thereby stopping spending that he or she disapproves. Constitutional limitations on expenditures of

public funds by either branch require due process of law as set forth in constitutional provisions read as a whole.

It is unlikely that the phrase "effect the necessary economies" could be plainly read to mean that the Legislature, in proposing the amendment to this article, or the People in ratifying the amendment, could have construed the plain meaning of these words to grant the Governor the unfettered power to transfer funds without specific legislative authority.

The alternative interpretation would allow a Governor the "broad" power to remake the budget allocations without legislative concurrence. One cannot deny that a Governor acting alone is more efficient and practical in addressing a deficit or any problem. Our constitutional history in government, however, has chosen to employ separate, divided powers to address governance—including the allocation of tax revenue through the budget. Although divided government is a less efficient and more impractical method of governing, our history and experience with authority cautions us against entrusting unbridled expenditure authority in any one person. Article I, section 35 of this State's Constitution states that "a frequent recurrence to fundamental principles is absolutely necessary to preserve the blessings of liberty." In our Constitution, the authority to appropriate funds is jointly exercised by the Legislature through the power to make laws and the Governor through the veto.[3] Once a budget is enacted, it is textually unsupportable to contend that the Governor then holds the power to unilaterally amend the budget in violation of statute.

Article III, section 5, requires the Governor to prevent a deficit giving consideration to total expenditures and total revenues. Temporary halts in expenditures, escrowing of funds awaiting legislative action, furloughs and other similar actions are constitutional because these actions reduce "total expenditures." Diverting the Highway Trust Fund to the General Fund and expending the money does not reduce the "total expenditure" of state government but merely transfers money contrary to the budget appropriation statute. A transfer of this nature does not avoid the deficit but merely continues the status quo, which the phrase "necessary economies" under article III, section 5 is required to alter. Furthermore the trans-

---

3. Since the passage of article III, section 5, the Legislature has met every year, in part to revise the state budget. In addition to these annual first and second sessions, the Legislature has met for extra sessions 26 times since 1977 at the call of the Governor to address issues requiring immediate legislative action.

fer of these funds, designated by the budget statute for one purpose and transferred by the Governor to another does not fulfill the Executive's duty to administer the budget enacted by the Legislature, nor does it assure that the laws are faithfully executed.

With this framework of constitutional authority and the persuasive authority of *In Re Separation of Powers*, we examine prior decisions of this Court. In *Tolson*, 169 N.C. App. 636, 610 S.E.2d 443, this Court affirmed the trial court's determination that the provisions of Executive Order 19 that escrowed local government tax reimbursements and local government tax-sharing funds to a reserve where they would await a determination that they would be necessary to address the budget are within the authority granted to the Governor under article III, section 5(3). Executive Order 19 states that the funds would be returned to "local government reimbursement funds, if possible, after determination that such funds are not necessary to address the deficit." Exec. Order No. 19, sec. 9, 16 N.C. Reg. 1866 (Mar. 1, 2002). Neither the Executive Order nor the *Tolson* Court addressed which branch or branches of government would make the determination, after escrow, as to whether such funds would be necessary to address the budgetary deficit.

Subsequent statutory history demonstrates this determination was made by the Legislative and Executive branches jointly as each of the statutory provisions establishing local government tax reimbursements was repealed by the General Assembly pursuant to Session Law 2001-424, § 34.15(a) as amended by Session Law ch. 2002-126, § 30A.1, effective 1 July 2002. 2001 N.C. Sess. Laws ch. 2105-06; 2002 N.C. Sess. Laws ch. 503. By the time this Court heard *Tolson* in 2005, the statute directing the expenditures had been repealed, and the money reallocated by the Legislature in its 2002 sessions. The funds for reimbursement of the local government therefore were extinguished by the Governor and the Legislature acting jointly to balance the budget.

Unlike plaintiffs herein, the *Tolson* plaintiffs did not assert or claim to represent citizen interests in the Trust Fund. While the *Tolson* Court addressed the withholding of local government tax reimbursements and tax-sharing funds, plaintiffs herein raise issues with the transfer of Trust Fund monies as directed by section 5. *See Tolson*, 169 N.C. App. 637, 610 S.E.2d 445; Exec. Order 19, secs. 7, 9, 16 N.C. Reg. 1866 (March 1, 2002). Indeed, the *Tolson* Court did not address any of the other sections of Executive Order 19, and none, except Section 5 dealing with the Trust Fund, appear

to divert funds in a manner which excluded participation by the General Assembly.

*Tolson* holds that the phrase "effect the necessary economies" does allow the Governor to escrow funds appropriated by the Legislature. Stopping spending or escrowing funds has an obvious nexus with the purpose of the power conferred to prevent a deficit by stopping expenditures for which there is no revenue, until such time as the co-equal branch of government can meet and the Governor and Legislature can remedy the deficit by either reducing expenditures or increasing revenue. By escrowing the funds the Governor halts the total expenditures of the government as they relate to total revenue, preventing a deficit.

The *Tolson* plaintiffs, however, did raise the same issue as plaintiffs herein with regard to article V, section 5 of the North Carolina Constitution. Here, *Tolson* is binding. N.C. Const. art. V, § 5 states: "Every act of the General Assembly levying a tax shall state the special object to which it is to be applied, and it shall be applied to no other purpose." The plaintiffs in *Tolson* argued that the funds withheld by the Governor were funds that the General Assembly allocated to local governments. *Tolson*, 169 N.C. App. at 639, 610 S.E.2d at 446. By holding those funds in escrow, the plaintiffs claimed the Governor applied those funds to an "object" and "purpose" not specified by the General Assembly. Finding that the Governor's actions did not violate the Constitution, the Court held: "[N]othing about Article V, Section 5 of the Constitution suggests that it is directed at the Governor and his duty to 'effect the necessary economies in State expenditures.' N.C. Const. art. III, § 5(3). Rather, the special objects language is directed at the General Assembly." *Id.* The *Tolson* Court further held that the Governor's withholding of the funds was not a violation of the separation of powers doctrine. *Id.* at 639, 610 S.E.2d at 446. In *Tolson*, the Governor exercised powers that were constitutionally committed to his office without invasion on the legislative branch's power. *Id.*

In *Stone*, 191 N.C. App. 418, 664 S.E.2d 32 (2008), this Court affirmed the trial court's injunction which held that the Governor's powers under article III, section 5(3) to "effect the necessary economies" were limited by article V, section 6(2) of the North Carolina Constitution. The State employee plaintiffs in *Stone* argued that Executive Order No. 3 was unlawful, because it directed the State Controller to receive the employer portions of retirement contributions for all State employees and to place them in a special

escrow fund, pending a "determination that such funds were not necessary to address the deficit." *Stone*, 191 N.C. App. at 404, 664 S.E.2d at 34. This language is identical to that portion of Executive Order No. 19 at issue in *Tolson*. The Court also held that placing the funds in temporary escrow was an impermissible "diversion" in violation of the State Constitution and contractual guarantees to State retirees.

*Stone* and *Tolson* both involved the escrow of funds. While the *Tolson* Court held that article III, section 5(3) permitted the Governor to transfer the funds in question to a temporary escrow account, thereby withholding them from local governments, the *Stone* Court held that placing the retirement contribution funds in a temporary escrow account was an impermissible "diversion" in violation of the explicit language of article V, section 6(2) and contractual guarantees to State retirees. *Tolson*, 169 N.C. App. at 640, 610 S.E.2d at 446 (determining that Executive Order 19 was a constitutional exercise of the Governor's authority); *Stone*, 191 N.C. App. at ——, 664 S.E.2d at 43-44. *Stone*, while not addressing *Tolson's* holding, is instructive in that it illustrates that the Governor's powers under article III, section 5 are not constitutionally unlimited. *Stone* holds that other sections of the State Constitution, specifically article V, section 6(2), do provide a limitation on the Governor's abilities to "effect the necessary economies." *Stone*, 191 N.C. App. at 418, 664 S.E.2d at 37.

The case *sub judice* is factually distinct from *Tolson* because this case does not just involve escrowing money in a reserve account but also involves transferring funds, which the General Assembly has allocated for highway purposes to the General Fund, in violation of the statute, the "Appropriations Act of 2001." Because the Governor has a duty to "faithfully execute the laws," article V, section 5(4), a limit on the ability to "effect the necessary economies" would be the appropriation statutes enacted as a result of the constitutionally based procedures for expenditures contained in N.C. Const. art. II, §§ 22(6), 23. Likewise, article V, section 7 limits the Governor's abilities to draw public money from the State Treasury, but "in consequence of appropriations made by law." The record is clear from which statutory appropriation the $80,000,000 was transferred, but it is unclear to which statutory appropriation these funds went. Since the 2001-2002 appropriation act was never amended to authorize or ratify the transfer, the original appropriations act was the only constitutional enactment upon which the expenditure of these funds could have been drawn. It is obvious that the appropriation statute was not followed in the transferring of the $80,000,000. We hold that

while the Governor may "escrow" the Highway Trust Fund monies to prevent a deficit, he or she may not transfer appropriated Highway Trust Fund monies without awaiting appropriate legislative authority from the General Assembly.

What further distinguishes this case from *Tolson* is that the action of the Governor in transferring $80,000,000 of Trust Fund monies directly into the General Fund without awaiting legislative action is that the transfer does not effect an economy, to wit: it does not reduce spending or diminish the deficit. Section 5 of Executive Order 19 reads as follows: "[The Office of State Budget and Management] may transfer, as necessary, funds from the Highway Trust Fund Account for support of General Fund appropriation expenditures." Exec. Order No. 19, 16 N.C. Reg. 1866 (Mar 1, 2002). This Order and the action of Secretary Tolson in transferring $80,000,000 fails to effect any economy. In fact, this action was the very antithesis of effecting an economy as it was explicitly intended to support General Fund appropriation expenditures. Ratification for the transfer was not subsequently adopted by the General Assembly. The appropriation statute effecting the spending of Trust Fund monies was not amended for the year 2001-2002.

As previously discussed, all other provisions of Executive Order 19 stop spending temporarily awaiting some unnamed power to make budgetary adjustments. Because we presume the Executive Order would follow a constitutional procedure, we read the Executive Order to refer to the General Assembly and the Governor in these proclamations as the appropriate bodies to make these adjustments. This action would be consistent with the text of the Constitution with regard to the manner in which public money is spent; the enacted appropriation statute; the historical practice which led up to the adoption of article III, section 5; the history of legislative action in both *Tolson* and *Stone*; and legislative history of the $125,000,000 involved in this appeal.

IV.

We therefore reverse in part the trial court's order denying plaintiffs' Motion for Summary Judgment and granting defendants' Motion for Summary Judgment. We hold that the Constitution of North Carolina article III, section 5 is a grant of authority to the Governor, which is limited to escrowing or reducing budgeted expenditures and does not create a power to transfer and spend funds appropriated for one purpose to another purpose without statutory authority. We further declare the transfer of $80,000,000 from the Highway Trust Fund

to the General Fund in fiscal year 2001-2002 by the Governor exceeded his constitutional authority under N.C. Const. art. III, § 5. We affirm the decision of the trial court with regard to the $125,000,000 statutory transfer for reasons expressed above. Except as reversed herein, the trial court's order is otherwise affirmed.

Reversed in part; affirmed in part.

Judge JACKSON concurs.

Judge McGEE concurring in the result in part and dissenting in part with separate opinion.

McGEE, Judge, concurring in the result in part and dissenting in part.

I.

I respectfully dissent from Section IV of the majority opinion. I believe the Governor acted within the Governor's constitutional authority in allocating monies from the Trust Fund to be used for General Fund expenditures in order to avoid a budget deficit. I concur in the result for the remainder of the majority opinion. I would fully affirm the ruling of the trial court.

> Questions of constitutional construction are in the main governed by the same general principles which control in ascertaining the meaning of all written instruments, and "the fundamental principle of constitutional construction is to give effect to the intent of the framers of the organic law and of the people adopting it[.]" The heart of the law is the intention of the lawmaking body. And in arriving at the intent, we are not required to accord the language used an unnecessarily literal meaning. Greater regard is to be given to the dominant purpose than to the use of any particular words, for "the letter of the law is its body; the spirit, its soul; and the construction of the former should never be so rigid and technical as to destroy the latter." "The letter killeth, but the spirit giveth life."

*Perry v. Stancil*, 237 N.C. 442, 444, 75 S.E.2d 512, 514 (1953) (internal citations omitted). The intent of the General Assembly, when drafting a constitutional amendment, unlike drafting a statute, is but a part of the intent analysis. We must also consider the intent of the voters of North Carolina who ratified the amendment. *State ex rel. Martin v.*

*Preston,* 325 N.C. 438, 449, 385 S.E.2d 473, 478 (1989); *Stancil,* 237 N.C. at 444, 75 S.E.2d at 514.

> The will of the people as expressed in the Constitution is the supreme law of the land. In searching for this will or intent all cognate provisions are to be brought into view in their entirety and so interpreted as to effectuate the manifest purposes of the instrument. The best way to ascertain the meaning of a word or sentence in the Constitution is to read it contextually and to compare it with other words and sentences with which it stands connected.

*Preston,* 325 N.C. at 449, 385 S.E.2d at 478 (quoting *State v. Emery,* 224 N.C. 581, 583, 31 S.E.2d 858, 860 (1944)). "[R]econciliation is a fundamental goal . . . in constitutional . . . interpretation[.]" *Sessions v. Columbus County,* 214 N.C. 634, 638, 200 S.E. 418, 420 (1939).

The majority contends that " 'effect the necessary economies' is an ambiguous term, requiring judicial construction" and the "dispositive issue . . . is determining the meaning of the phrase 'effect the necessary economies' as contained in N.C. Const. art. III, § 5(3), and how this was accomplished by the transfer of $80,000,000 from the Trust Fund to the General Fund." However, I disagree that when Article III, Section (5)(3) is read as a whole, and *in pari materia* with the other provisions of our Constitution, *Preston,* 325 N.C. at 449, 385 S.E.2d at 478, the meaning of "effect the necessary economies" is ambiguous. Additionally, the ultimate intent and purpose behind the amendment to Article III, Section 5(3) is more important in construing that constitutional provision than interpreting its precise wording. *Stancil,* 237 N.C. 442, 444, 75 S.E.2d 512, 514. Article III, Section 5(3) states in relevant part:

> The total expenditures of the State for the fiscal period covered by the budget shall not exceed the total of receipts during that fiscal period and the surplus remaining in the State Treasury at the beginning of the period. To insure that the State does not incur a deficit for any fiscal period, the Governor shall continually survey the collection of the revenue and shall effect the necessary economies in State expenditures, after first making adequate provision for the prompt payment of the principal of and interest on bonds and notes of the State according to their terms, whenever he determines that receipts during the fiscal period, when added to any surplus remaining in the State Treasury at the beginning of the period, will not be sufficient to meet budgeted expenditures.

N.C. Const. art. III, § 5(3). I would hold that the clear intent of the amendment to Article III, Section 5(3) is to grant the Governor broad discretion and powers to ensure that a budget, as enacted by the General Assembly, will not lead the State into a deficit. Because Article III, Section 5(3) mandates that the Governor has responsibility for: (1) executing the budget, (2) continually monitoring the budget to identify potential budgetary shortfalls, and (3) effecting the necessary economies in order to prevent a deficit, the Governor has the authority and duty to reallocate funds within the current budget, without the consent or approval of the General Assembly, in order to prevent any projected deficit.

The majority argues: "In order for the Governor to exercise his powers to 'effect the necessary economies,' he must survey revenue collections to avoid a deficit in the State Budget[.]" The relevancy of focusing on the definition of "deficit" in the majority opinion is unclear, as there has been no argument made on appeal that the State was not facing a deficit. However, from the language of Article III, Section 5(3), the Governor must, in a practical sense, predict whether the "receipts during the fiscal period, when added to any surplus remaining in the State Treasury at the beginning of the period, will not be sufficient to meet budgetary expenditures." Article III, Section 5(3) vests the power and the duty to make this determination with the Governor. It is the Governor's *determination* that the State is *facing* a potential budget deficit that triggers the Governor's authority to "effect the necessary economies" to avoid the anticipated deficit.

Were the Governor to wait until after the State incurred a deficit, which would be a certain means of identifying an actual budget crisis, the Governor would violate the mandate of Article III, Section 5(3)— the *prevention* of a deficit, not the correction of an existing deficit.[4]

## II.

The majority seems to determine that the Governor, by directing the transfer of $80,000,000.00 from the Trust Fund to the General Fund, violated the separation of powers doctrine because the sole power to direct transfer of funds from the Trust Fund to the General Fund lies with the General Assembly. While I agree that the determi-

---

4. The majority states that the actions of the Governor did "not effect an economy, to wit: [they did] not reduce spending or *diminish the deficit*." (Emphasis added). Again, Article III, Section 5(3) mandates proactive steps from the Governor to prevent a deficit, not reactive steps to diminish an existing deficit. By providing this mandate in broad and general language, Article III, Section 5(3) grants the Governor discretion in the manner in which the Governor acts to prevent a budget deficit.

nation of this issue is inextricably intertwined with the separation of powers doctrine, my review of the case law, legislative history, and constitutional history cited by the majority leads me to reach a different result.

As our Supreme Court stated in *Advisory Opinion In Re Separation of Powers*, 305 N.C. 767, 773, 295 S.E.2d 589, 592 (1982): " '*Separation of Powers*. The legislative, executive, and supreme judicial powers of the State government shall be forever separate and distinct from each other.' " *In Re Separation of Powers*, 305 N.C. at 773, 295 S.E.2d at 592 (citing N.C. Const. art. I, § 6). "[E]ach of our constitutions [has] explicitly embraced the doctrine of separation of powers." *State ex rel. Wallace v. Bone*, 304 N.C. 591, 595, 286 S.E.2d 79, 81 (1982) (footnote omitted).

The majority correctly states that the powers of the Governor in relation to the state budget are " 'preparing and recommending the state budget to the General Assembly and then for administering it after enactment[.]' " (Citation omitted). In relation to the state budget, the constitutional power of the General Assembly is to *enact* the state budget. "[O]ur Constitution vests in the General Assembly the power to *enact* a budget—to appropriate funds—but after that is done, Article III, Section 5(3) explicitly provides that 'the Governor shall administer the budget as enacted by the General Assembly.' " *In re Separation of Powers*, 305 N.C. at 780, 295 S.E.2d at 596. "It is clear that the framers of our Constitution followed the instructions given to them that our government 'shall be divided into three branches distinct from each other, viz:

> The power of making laws
> The power of executing laws and
> The power of Judging.' "

*Id.* at 774, 295 S.E.2d at 593 (citation omitted). Our Supreme Court quoted a portion of Article III, Section 5(3) to emphasize its point:

> The Governor shall prepare and recommend to the General Assembly a comprehensive budget of the anticipated revenue and proposed expenditures of the State for the ensuing fiscal period. *The budget as enacted by the General Assembly shall be administered by the Governor.*

*Id.* (emphasis added by our Supreme Court). "Consistent with Section 5(3) of Article III of the Constitution, . . . G.S. 143-2 designates the

Governor as *ex officio* Director of the Budget." *Id.* at 776, 295 S.E.2d at 594.

*In re Separation of Powers* was an advisory opinion issued by our Supreme Court to determine whether certain statutes enacted by the General Assembly were constitutional. The first issue concerned a statute, N.C. Gen. Stat. § 143-23(b), which attempted to give the "Joint Legislative Commission on Governmental Operations" the power to veto certain transfers or changes "from a program line item" of the then current budget. The Joint Legislative Commission on Governmental Operations was comprised primarily of elected members of the General Assembly. *Id.*

Obviously, the intended effect of G.S. 143-23(b) . . . is to give to a 13-member commission composed of 12 members of the House and Senate, and the President of the Senate who is usually the Lieutenant Governor, power to control major budget transfers proposed to be made by the Governor in his constitutional role as administrator of the budget.

*Id.* Our Supreme Court rendered its opinion that

the power that G.S. 143-23(b) purports to vest in certain members of the legislative branch of our government exceeds that given to the legislative branch by Article II of the Constitution. The statute also constitutes an encroachment upon the duty and responsibility imposed upon the Governor by Article III, Section 5(3), and, thereby violates the principle of separation of governmental powers.

*Id.* at 776-77, 295 S.E.2d at 594. I do not find support in *In re Separation of Powers* for the majority's holding that the General Assembly must be a partner with the Governor when the Governor is administering the state budget as mandated by Article III, Section 5(3). Instead, *In re Separation of Powers* seems to hold the opposite. *In re separation of Powers* holds that N.C. Gen. Stat. § 143-23(b), which seeks to give "power to control major budget transfers proposed to be made by the Governor in his constitutional role as administrator of the budget" to a commission made up of members of the General Assembly, "constitutes an encroachment upon the duty and responsibility imposed upon the Governor by Article III, Section 5(3), and, thereby violates the principle of separation of governmental powers." *Id.*

III.

The majority further states that Article III, Section 5(3) "equates with article V, section 7 and article III, section 5(4) of this State's Constitution." As stated ·by the majority: "Article III, section 5(4) requires that the Governor take care that the laws be faithfully executed. The Governor as head of the executive department is charged with the duty of seeing that legislative acts are carried into effect." If we follow the logical implication of the majority in citing Article III, Section 5(4) in support of its holding, we would have to interpret Article III, Section 5(4) to mean that the Governor would have no discretion when it comes to state spending when the General Assembly, by enacting a budget, earmarks certain amounts for certain items. In other words, once the General Assembly has enacted a budget, the Governor would have no power to deviate from the amounts allocated for the items in that budget. This interpretation seriously weakens the mandate of Article III, Section 5(3), the provision immediately preceding, which charges the Governor with "effect[ing] the necessary economies" in order to prevent a deficit. We must, if at all possible, reconcile the different provisions of our Constitution so that all provisions have meaning and effect. *Sessions*, 214 N.C. at 638, 200 S.E. at 420.

If the General Assembly enacts a budget and the Governor determines that the budget, as enacted, will lead to a deficit, but the Governor has no authority to modify the allocation of funds within the budget or even to make budgetary cuts—as that would not be ensuring that the "legislative acts are carried into effect" *exactly* as passed—then the Governor is without power to effect the constitutional duty imposed upon the Governor by Article III, Section 5(3). This interpretation of the powers granted to the Governor pursuant to Article III, Section 5(3) is undercut by *In re Separation of Powers*, *supra*, and this Court's decision in *County of Cabarrus v. Tolson*, 169 N.C. App. 636, 637, 610 S.E.2d 443, 445 (2005); *see also Preston*, 325 N.C. at 449, 385 S.E.2d at 478.

The plaintiffs in *Tolson* specifically "alleged that the Secretary [of Revenue] was required to distribute [funds allocated by statute] to local governments pursuant to chapter 105 of the North Carolina General Statutes." *Id.* at 637, 610 S.E.2d at 445. The *Tolson* Court held that the Governor acted pursuant to his duties under Article III, Section 5(3) in transferring funds allocated by the General Assembly for the purpose of funding local government for use in funding other budgetary items, in order to prevent a deficit. *Id.* at 638-39, 610 S.E.2d

443, 446. This holding contradicts the majority's suggestion that Article III, Section 5(4) mandates that the Governor must always execute the budgetary laws exactly as the General Assembly has enacted them, even when acting pursuant to the powers granted by Article III, Section 5(3).

If, in drafting Article III, Section 5, the General Assembly intended for itself to have the actual power to make budgetary changes to prevent a deficit, then the General Assembly could certainly have done so by enacting new budgetary legislation to remedy the problem, thereby placing the burden of preventing a deficit on the General Assembly. As set out in more detail below, using legislation as the only tool for addressing an impending deficit would be both inefficient and impractical. I believe the intent of the General Assembly in drafting Article III, Section 5(3) was to provide the Governor with the necessary discretion and authority to immediately address a predicted deficit by using appropriate means, including budget cuts or reallocation of funds, so long as the Governor limits these actions to items included within the current budget.

The majority further states: "Article V, section 7 requires that '[n]o money be drawn from the State treasury but in consequence of appropriations made by law[.]' [This] means that there must be legislative authority in order for money to be validly drawn from the treasury." I do not disagree with the majority's interpretation as a general principle. However, there is no evidence in the record, nor argument made on appeal, that any of the $80,000,000.00 withdrawn from the Trust Fund was spent on any item not included in the relevant budget passed by the General Assembly. As the majority states "it is unclear to which statutory appropriation [the $80,000,000.00] went."

If Article V, Section 7 can be construed in any manner to support the majority holding, it would have to be interpreted as giving the General Assembly broad and continuing powers over a budget *after* it has been passed, which would, according to *In re Separation of Powers*, violate the separation of powers doctrine. *In re Separation of Powers*, 305 N.C. at 776-77, 295 S.E.2d at 594. Such an interpretation would serve to exceed the powers granted the General Assembly by Article II, and infringe upon the rights and duties of the Governor as established in Article III, Section 5(3).

IV.

The majority cites two opinions from our Court, *Tolson* and *Stone v. State*, 191 N.C. App. ——, 664 S.E.2d 32 (2008), that it finds relevant

to this case. First, I would distinguish *Stone* as it is not relevant on the facts before us. The majority states: "The [*Stone*] Court . . . held that placing the funds in temporary escrow was an impermissible 'diversion' in violation of the state constitution[.]" The majority further states that the holding in *Stone* "is instructive in that it illustrates that the Governor's powers under article III, section 5 are not constitutionally unlimited." There has been no argument made, and I would reject any such argument, that Article III, Section 5 grants the Governor *unlimited* powers in carrying out his or her constitutional duties pursuant to Article III, Section 5(3).[5] *Stone*, however, is clearly limited in its holding. In *Stone*, the Governor attempted to divert funds from a retirement fund for State employees. Our Court held that the Governor's action was impermissible because "Article V, section 6(2) of the North Carolina Constitution not only precludes retirement system funds from being 'applied,' 'loaned to,' or 'used by' the State, but also precludes those funds from being 'diverted' by the State." *Stone*, 191 N.C. App. at ——, 664 S.E.2d at 37. Article V, Section 6(2) of our Constitution *expressly* prohibits use of State employee retirement funds for any purpose other than funding retirement benefits and necessary expenses for former State employees.

> Neither the General Assembly nor any public officer, employee, or agency shall use or authorize to be used any part of the funds of the Teachers' and State Employees' Retirement System or the Local Governmental Employees' Retirement System for any purpose other than retirement system benefits and purposes, administrative expenses, and refunds[.]

N.C. Const. art. V, § 6. There is no equivalent constitutional provision expressly preventing the use or diversion for other purposes of the funds at issue in this case. *Stone* illuminates no issue in this appeal.

The majority conducts a more extensive analysis of *Tolson*, an opinion construing part of Executive Order 19, the same executive order at issue in this case, in an attempt to distinguish it from the facts of this case. The plaintiffs in *Tolson*, a group of North Carolina counties, cities and towns, argued *inter alia* that Executive Order 19

---

5. The majority also states "our history and experience with authority cautions us against entrusting unbridled expenditure authority in any one person." Nothing in this dissent suggests the Governor has "unbridled expenditure authority." The Governor's actions in "effecting the necessary economies" are limited by Article III, Section 5(3) to situations where there is a projected deficit. The Governor may only operate within the budget passed by the General Assembly. The Governor may not authorize expenditures for items not included within the current budget.

violated our constitution because it took "funds allocated for local governments and [used] them for other purposes that the General Assembly did not authorize." *Tolson*, 169 N.C. App. at 639, 610 S.E.2d at 446. Our Court is clearly bound by *Tolson, In Re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 36 (1989), and *Tolson* is not distinguishable from the relevant analysis of the appeal before us.

The majority first states "the *Tolson* Court held that article III, section 5(3) permitted the Governor to *transfer* the funds in question to a temporary escrow account[.]" (Emphasis added). The majority further states: "The case *sub judice* is factually distinct from *Tolson* because this case does not just involve escrowing money in a reserve account but *also involves transferring funds*, which the General Assembly has allocated for highway purposes to the General Fund, in violation of statute, the 'Appropriations Act of 2001'." (Emphasis added). The majority then holds that "while the Governor may 'escrow' the Highway Trust Fund monies to prevent a deficit, *he or she may not* transfer *appropriated Highway Trust Fund monies without awaiting appropriate legislative authority from the General Assembly*." (Emphasis added). The majority's holding appears to contradict its stated understanding of the *Tolson* holding. The majority states that, pursuant to the *Tolson* holding, "article III, section 5(3) [*did permit*] the Governor to *transfer* the funds in question to a temporary escrow account[.]" (Emphasis added). The *Tolson* Court stated that Article III, Section 5(3) "clearly places a duty upon the Governor to balance the budget and prevent a deficit." *Tolson*, 169 N.C. App. at 638, 610 S.E.2d at 445.

> [W]e interpret expenditures to be payments, disbursements, allocations or otherwise, that are budgeted to be paid out of State receipts within a fiscal period. It is these expenditures that the Governor must effect to balance the budget against the expected or anticipated receipts within that same period.

> Under the circumstances in this case, the Governor issued Executive Order 19 in order to prevent expenditures from unbalancing the state budget. A failure to exercise his duty under the Constitution via Executive Order 19 would have resulted in a deficit, a state of budgetary crisis that is precisely what Article III, Section 5(3) of the North Carolina Constitution prohibits.

> Furthermore, Executive Order 19 did not violate the separation of powers doctrine, as plaintiffs suggest. A violation of the separation of powers doctrine occurs when one branch of state gov-

ernment exercises powers that are reserved for another branch of state government. *Ivarsson v. Office of Indigent Def. Servs.*, 156 N.C. App. 628, 631, 577 S.E.2d 650, 652 (2003). *Implicit in the duty to prevent deficits is the ability of the Governor to affect the budget he must administer. See, e.g., Advisory Opinion In re Separation of Powers*, 305 N.C. 767, 295 S.E.2d 589 (1982) (noting that *the Governor's constitutional duty to balance the budget was* paramount *to the General Assembly's desire to control major budget transfers*). In this case, the Governor exercised powers that were constitutionally committed to his office without invasion on the legislative branch's power.

*Id.* at 638-39, 610 S.E.2d at 445-46 (emphasis added).

The majority in the case before us next adds:

What further distinguishes this case from *Tolson* is that the action of the Governor in transferring $80,000,000 of Trust Fund monies directly into the General Fund without awaiting legislative action is that the transfer does not effect an economy, to wit: it does not reduce spending or diminish the deficit.

However, by transferring money from the Trust Account, it is fair, or at a minimum possible, to infer that spending on transportation-related items was diminished (*i.e.*, spending on certain approved projects was reduced or withheld altogether). That this money might have then been spent on different items included in the budget does not mean that the reallocation of the money did not serve to prevent a deficit.

By definition, a projected deficit occurs when revenue is projected to fall short of what was predicted, spending is projected to exceed what was predicted, or a combination thereof is projected. Therefore, it is not always necessary to reduce overall spending to prevent a deficit; it is only necessary to ensure that overall spending does not outpace overall revenue (plus monies already held by the State Treasury) for the relevant fiscal period.

For example, it is possible for the Trust Fund to have a projected surplus, but for the General Fund to have a projected deficit larger than the projected Trust Fund surplus, thereby creating an overall projected deficit. The Governor must then determine how to allocate funds to prevent the projected deficit. The Governor might cut funding for multiple items paid out of the General Fund, but make a determination that further cuts were not possible because all that re-

mained were items vital to the continued functioning of State government. The Governor could then cut spending of Trust Fund monies, and potentially reduce spending in this way to a point where projected spending did not outpace projected revenue. However, vital government agencies and programs would still be underfunded, resulting in the inability of our government to function effectively, or respond to crises. As an alternative, by reallocating monies from the Trust Fund rather than simply cutting spending within the Trust Fund, the Governor would be able to fund those items vital to the effective functioning of State government, *and* also prevent a deficit, meeting the intent of Article III, Section 5(3).

This scenario and the facts of the case before us are indistinguishable in any meaningful manner from those in *Tolson*. In *Tolson*, Executive Order 19 required certain funds slated for payment to local governments to be suspended, and those monies held for reallocation to help prevent a projected deficit. Restated, in order to prevent a projected deficit, that portion of Executive Order 19 transferred monies that were budgeted for one purpose—funding local governments—from one fund to another. It reallocated the monies to purposes for which they were not originally budgeted by the General Assembly. In this case, the only difference is that the monies were transferred from a different source—monies budgeted for transportation-related projects instead of monies budgeted for local governments. As the majority affirms,

> the General Assembly has determined that one of the 'objects' of the Trust Fund is to supplement the General Fund. Use of the Trust Fund monies for [supplementing the General Fund] thus cannot be viewed as a 'raid' of the Trust Fund for purposes not previously sanctioned by the General Assembly.

Additionally, the holding of the majority appears internally inconsistent with its analysis. The ultimate effect of the majority opinion is a requirement that the General Assembly pass legislation for any expenditure changes in a current budget. The majority attempts to make a distinction between "escrowing" and "reducing," and "transferring" and "spending." If the General Assembly has passed a budget stating that a certain amount of funds shall be expended for a certain item, pursuant to the reasoning of the majority, the Governor would be violating the separation of powers if the Governor "reduced" spending on that item just as surely as if the Governor "transferred" funds away from that item to be spent on another item in the current

budget. This is so because the Governor, in refusing to fund an item in the amount stated in the current budget, would be acting without legislative authority in a budgetary action that had not been approved by the General Assembly, and in direct conflict with the provisions of the approved budget.

However, even pursuant to the interpretation of the majority, our Court in *Tolson* has expressly held that transferring funds from one budgetary item to an escrow account set up for the potential funding of another budgetary item is constitutional pursuant to the powers and duties of the Governor under Article III, Section 5(3). I see no way to reconcile the majority holding with our Court's holding in *Tolson*.

The majority also states: "Executive Order 19 states that the [transferred] funds [initially budgeted for local government] would be returned to 'local government reimbursement funds, if possible, after determination that such funds are not necessary to address the deficit.' " The majority then reasons: "Neither the Executive Order nor the *Tolson* Court addressed which branch or branches of government would make the determination as to whether such funds would be necessary to address the budgetary deficit." I believe this issue was not addressed in either Executive Order 19 or the *Tolson* opinion because there *was* no issue or question concerning this matter. Article III, Section 5(3) mandates that the Governor

> shall continually survey the collection of the revenue and shall effect the necessary economies in State expenditures, . . . whenever he determines that receipts during the fiscal period, . when added to any surplus remaining in the State Treasury at the beginning of the period, will not be sufficient to meet budgeted expenditures.

N.C. Const. art. III, § 5(3). In *Tolson*, the determination as to whether the funds would be necessary to address the budgetary deficit was, by constitutional mandate, the Governor's determination to make. Any attempt by the General Assembly to exercise the powers and duties mandated in Article III, Section 5(3) would constitute a violation of the separation of powers doctrine.

I do not agree with the majority's argument that the subsequent actions of the General Assembly demonstrate "this determination was made by the Legislative and Executive branches jointly" simply because the General Assembly eventually repealed the statutes establishing local government tax reimbursements. Any argument that

Executive Order 19 and the repeal of these statutes are connected is mere speculation. There is less support for the majority's blanket statement that none of the sections included in Executive Order 19, other than the one dealing with the Trust Fund, "appear to divert funds in a manner which excluded participation by the General Assembly." *Tolson* does not suggest any of the sections of Executive Order 19 required legislative authority for the executive actions proposed. The *Tolson* opinion does not hold, nor, in my opinion, anywhere infer, that the Governor, or other executive officials, could not act upon Executive Order 19 "until such time as the co-equal branch[es] of government [could] meet and the Governor and Legislature [could] remedy the deficit by either reducing expenditures or increasing revenue[,]" as the majority states.

The *Tolson* Court held that "nothing about Article V, Section 5 of the Constitution suggests that it is directed at the Governor and his duty to 'effect the necessary economies in State expenditures.' N.C. Const. art. III, § 5(3). Rather, the special objects language is directed at the General Assembly." *Tolson*, 169 N.C. App. at 639, 610 S.E.2d at 446. Article V, Section 5, which this Court held in *Tolson* only applies to the General Assembly, states: "Every act of the General Assembly levying a tax shall state the special object to which it is to be applied, and it shall be applied to no other purpose." N.C. Const. art. V, § 5; *Tolson*, 169 N.C. App. at 639, 610 S.E.2d at 446.

In rejecting the *Tolson* plaintiffs' argument that Article V, Section 5 applied to the Governor and prevented him from using funds for some purpose other than "the special object to which [they were] to be applied," our Court sanctioned the actions of the Governor in doing exactly that—using revenue collected and approved by the General Assembly for a "special object" in the budget for other purposes—pursuant to the authority granted him under Article III, Section 5(3). *Tolson*, 169 N.C. App. at 640, 610 S.E.2d at 446. If the *Tolson* Court's holding intended that the Governor must act together with the General Assembly in carrying out the directives of Executive Order 19, then Article V, Section 5 *would have applied,* as *Tolson* holds that section is *directed to the General Assembly.* By holding that Article V, Section 5 did not apply in *Tolson,* our Court was necessarily holding that the executive branch *alone* was responsible for carrying out the directives of Executive Order 19. *Id.*

Furthermore, even if the Governor requested that the General Assembly repeal the relevant statutes, and the General Assembly then decided it was in the best interest of the State to do so, this kind of

"working together" is consistent with the separation of powers doctrine. What would be inconsistent with the separation of powers doctrine is a *requirement* that the General Assembly approve acts the Governor decides to take in "effecting the necessary economies" to avoid a budget deficit pursuant to Article III, Section 5(3). The acts of the General Assembly cited by the majority do not suggest that the General Assembly was in any manner giving "necessary approval" for the portions of Executive Order 19 addressed in *Tolson*. In fact, there is nothing cited by the majority upon which to base any assumption that these separate executive and legislative actions were in any manner directly related. The *Tolson* Court simply held that the Governor was acting pursuant to the mandate of Article III, Section 5(3) when he issued Executive Order 19. *Tolson*, 169 N.C. App. at 640, 610 S.E.2d at 446 ("we determine that Executive Order 19 was a constitutional exercise of the Governor's authority"). *Tolson* further held that Executive Order 19 did not violate the separation of powers doctrine, stating:

> Implicit in the duty to prevent deficits is the ability of the Governor to affect the budget he must administer. *See, e.g., Advisory Opinion In re Separation of Powers,* 305 N.C. 767, 295 S.E.2d 589 (1982) (noting that *the Governor's constitutional duty to balance the budget was paramount to the General Assembly's desire to control major budget transfers*). In this case, the Governor exercised powers that were constitutionally committed to his office without invasion on the legislative branch's power.

*Id.* at 639, 610 S.E.2d at 446 (emphasis added). The *Tolson* opinion does not support the majority's determination that the Governor could carry out the directives of Executive Order 19 only if he received approval from the General Assembly, whether in the form of legislation or through some other means. Instead, *Tolson* strongly suggests just the opposite—that both issuing Executive Order 19 and carrying out its provisions were the *sole* province of the executive branch. *Tolson* is in line with prior opinions of our Supreme Court suggesting that to determine otherwise would be to violate the separation of powers doctrine. *See Ivarsson v. Office of Indigent Def. Servs.,* 156 N.C. App. 628, 631-32, 577 S.E.2d 650, 652-53 (2003). As noted above, this does not mean the Governor *may* not seek action from the General Assembly, only that the Governor is not *required* to do so. Furthermore, contrary to the majority's inference, this dissent does not "contend that the Governor alone holds the power to amend the budget wholesale in violation of statute." The General Assembly

is always free to exercise its constitutional power to enact legislation, including budgets and budgetary amendments. Constitutionally, what the General Assembly does not do, however, is administer the budget or any amendments thereto.

## V.

The majority, in attempting to determine the intent of the General Assembly in order to interpret the meaning of "effecting the necessary economies," states that after the passage of Article III, Section 5(3), and before the passage of the Separation of Powers Act of 1982, "the determinations of budget reductions and transfers between budgets were handled jointly by the Governor and the 'Advisory Budget Commission' ('ABC')." The ABC was made up of both executive and legislative branch employees. As noted in the majority opinion, these joint executive and legislative actions ceased after our Supreme Court issued its opinion in *State ex rel. Wallace v. Bone*, 304 N.C. 591, 286 S.E.2d 79 (1982), following which our General Assembly enacted the Separation of Powers Act of 1982. 1981 N.C. Sess. Laws (Reg. Sess. 1982), Ch. 1191.

Our Supreme Court stated in *Wallace*: "There should be no doubt that the principle of separation of powers is a cornerstone of our state and federal governments." *Wallace*, 304 N.C. at 601, 286 S.E.2d at 84. Relying on this premise, and after analyzing multiple opinions from other states, our Supreme Court held that the separation of powers doctrine was violated by the enactment of N.C. Gen. Stat. § 143B-282 *et seq.*, which provided for an "Environmental Management Commission" (EMC), including members of the General Assembly, to exercise executive functions (for example, "supervision over the maintenance and operation of dams"[6]). *Id.* at 607, 286 S.E.2d at 88. The *Wallace* Court stated:

It is crystal clear to us that the duties of the EMC are administrative or executive in character and have no relation to the function of the legislative branch of government, *which is to make laws*. . . . [T]he legislature cannot constitutionally create a special instrumentality of government to implement specific legislation *and then retain some control over the process of implementation*[.]

*Id.* at 608, 286 S.E.2d at 88 (emphasis added). " '*[N]o person shall be capable of acting in the exercise of any more than one of [the three*

---

6. This power would necessarily include making funding decisions.

*branches of government] at the same time lest they should fail of being the proper checks on each other and by their united influence become dangerous[.]' " Id.* at 597-98, 286 S.E.2d at 83 (quoting instructions given to the Orange County delegation working on our State's first Constitution, which was adopted 18 December 1776) (emphasis added by the *Wallace* Court).

> [V]iolations [of the separation of powers doctrine] have occurred several times in the history of our state. *See State ex rel. Wallace v. Bone* and *Barkalow v. Harrington,* 304 N.C. 591, 286 S.E.2d 79 (1982) (holding that members of the General Assembly could not concurrently hold membership on the Environmental Management Commission, an executive branch agency, without violating the separate power of executive branch); *State v. Elam,* 302 N.C. 157, 273 S.E.2d 661 (1981) (allowing the General Assembly to make rules of practice and procedure for the state's appellate courts would violate the separation of powers, because those powers were reserved for the Supreme Court by Art.IV, § 13(2) of the Constitution of North Carolina); and *Person v. Watts,* 184 N.C. 499, 115 S.E. 336 (1922) (granting a taxpayer's request that the judiciary force the collection of taxes on stockholder income would violate the legislature's constitutional control over the power of taxation). Each of these cases dealt with the exercise of a power by one branch of government when the power was specifically outlined by the state constitution as belonging to another branch.

*Ivarsson,* 156 N.C. App. at 631-32, 577 S.E.2d at 652-53. Our Supreme Court decisions leading up to the Separation of Powers Act of 1982 hold that when the General Assembly exercises authority beyond the enactment of laws, and participates in the execution of those laws, it violates constitutional provisions defining and separating the powers of the three branches of government.

The General Assembly passed the Separation of Powers Act of 1982; and in response to the *Wallace* opinion, the General Assembly specifically re-wrote the relevant statute to ensure that members of the General Assembly could not serve on the EMC. 1981 N.C. Sess. Laws (Reg. Sess. 1982), Ch. 1191. §§ 2 and 19. The Separation of Powers Act of 1982 listed 32 specific boards and commissions on which members of the General Assembly could not serve, in recognition of the executive functions of those boards and committees. 1981 N.C. Sess. Laws (Reg. Sess. 1982), Ch. 1191. § 2. In effect, the General Assembly, in enacting the Separation of Powers Act of 1982, codified

the prior separation of powers holdings from our Supreme Court by re-writing multiple statutes in an attempt to ensure members of the General Assembly did not serve on any board or commission it believed acted in an executive or judicial capacity.

The General Assembly further ensured that boards or commissions which included members of the General Assembly were restricted to making recommendations to the executive and judicial branches of government, or advising the General Assembly on potential future legislation. For example, the statute involving the Economic Development Board was "rewritten to read: 'There is created within the Department of Commerce an Economic Development Board. The Board shall *advise* the Secretary of Commerce on: [specified duties, including] . . . the formulation of a budget[.]' " 1981 N.C. Sess. Laws (Reg. Sess. 1982), Ch. 1191. § 18 (emphasis added). The Separation of Powers Act of 1982 was entirely focused on *limiting* powers of the General Assembly in an attempt to avoid violation of the separation of powers doctrine.

The General Assembly subsequently curtailed the limits of its authority even further by enacting the Separation of Powers Act of 1985. 1985 N.C. Sess. Laws, Ch. 122. The Separation of Powers Act of 1985 revised numerous statutes to amend provisions requiring *approval* from the ABC (as noted by the majority, a joint executive-legislative commission) for executive acts, mandating instead that the Governor and certain executive agencies *consult* with the ABC before performing certain acts. 1985 N.C. Sess. Laws, Ch. 122. §§ 1-7 (*e.g.* "Sec. 3. G.S. 143B-426.11(7) is amended by deleting 'the approval of [the ABC]' and substituting 'consultation with [the ABC]' ".).

The following year, the General Assembly enacted "An Act to Further Provide for the Separation of Powers," referred to as the Separation of Powers Act of 1986. 1985 N.C. Sess. Laws (Reg. Sess. 1986), Ch. 955. In this act, the General Assembly removed language from the General Statutes that *required* the Governor or executive agencies to even *consult* with the ABC prior to taking executive action. All of the statutes amended in the Separation of Powers Act of 1985, along with many additional statutes, were further amended to this purpose. For example, N.C. Gen. Stat. § 108A-33(d) was amended "by deleting 'and consultation with the [ABC,]' and adding: 'Prior to taking any action under this subsection, the Director of the Budget [*i.e.* the Governor] *may* consult with the [ABC].' " 1985 N.C. Sess. Laws (Reg. Sess. 1986), Ch. 955. §§ 11-12 (emphasis added). N.C. Gen. Stat. § 143B-426.11(5) was amended

from: "At no time may the total outstanding indebtedness of the Agency, excluding bond indebtedness, exceed five hundred thousand dollars ($500,000) unless the Agency has consulted with the [ABC,]" to: "At no time may the total outstanding indebtedness of the Agency, excluding bond indebtedness, exceed five hundred thousand dollars ($500,000) unless the Agency has consulted with the Director of the Budget."[7] 1985 N.C. Sess. Laws (Reg. Sess. 1986), Ch. 955. § 99. N.C. Gen. Stat. § 143B-426.11(7) was amended from: "Subject to consultation with the [ABC] and under such conditions as the Board may deem appropriate to the accomplishment of the purposes of this Part, [the North Carolina Agency for Public Telecommunications] may distribute in the form of grants, gifts, or loans any of the revenues and earnings received by the Agency from its operations[,]" to: "Under such conditions as the Board may deem appropriate to the accomplishment of the purposes of this Part, [the Agency] may distribute in the form of grants, gifts, or loans any of the revenues and earnings received by the Agency from its operations[.]" 1985 N.C. Sess. Laws (Reg. Sess. 1986), Ch. 955. § 100. N.C. Gen. Stat. § 143B-426.11 was further amended by adding at the end of the statute: "Prior to taking any action under subdivisions (5) or (7) of this section, the Board *may* consult with the [ABC]." 1985 N.C. Sess. Laws (Reg. Sess. 1986), Ch. 955. § 101 (emphasis added). The language stating that the "Board may consult with the ABC" was ultimately deleted from N.C. Gen. Stat. § 143B-426.11 entirely. 2005 N.C. Sess. Laws (Reg. Sess. 2006), Ch. 203. § 107. These examples are but a fraction of the extended and continual revisions by the General Assembly, following opinions of our Supreme Court, codifying limitations of the General Assembly's constitutional powers in relation to the other two branches of state government.

This extensive legislative history concerning the separation of powers doctrine demonstrates increasing attention by the General Assembly to ensure it was not encroaching upon the powers and duties granted to the executive branch by Article III, Section 5(3), nor exceeding the powers granted to it by Article II. The actions of the General Assembly and the opinions of our appellate courts lead to the conclusion that the General Assembly may not interfere with the Governor's constitutional duties pursuant to Article III, Section 5(3) to prevent a deficit by effecting the necessary economies related to a budget the General Assembly has already enacted. Once a budget has been passed, it is solely the duty of the Governor to administer that

---

7. *I.e.,* the Governor.

budget. The General Assembly's check on the budgetary powers of the Governor may be exercised in the form of new legislation, not in requiring the Governor to obtain approval from the General Assembly for administrative budgetary decisions.

## VI.

The majority's suggestion that Executive Order 19 can be construed as constitutional only if it is assumed that none of the funds "escrowed" by the order may be utilized by the Governor in order to prevent a budget deficit without legislative action, is contrary to both the General Assembly's understanding of its role and authority in administering the budget, as evidenced by the Separation of Powers Acts and other legislation, and the decisions of our appellate courts. The General Assembly has recognized that active participation in *administering* the budget exceeds the authority granted it under Article II.

Informatively, the issue of separation of powers was directly addressed in a memorandum dated 20 May 1977 from Joe Ferrell (Ferrell) of the Institute of Government, to Dr. John R. Gamble (Chairman Gamble), then the Chairman of the House of Representatives Committee on Constitutional Amendments (the Committee) and sponsor of the bill to amend Article III, Section 5(3). Ferrell, who was closely involved in drafting the amendment of Article III, Section 5(3), responded to concerns raised by then director of the Institute of Government John Sanders (Sanders) that "the amendment should be neutral on the issue of whether and to what extent the General Assembly may constitutionally direct the manner in which the Governor administers the budget." Ferrell informed Chairman Gamble that he believed Sanders' point was a "good one," and further stated to Chairman Gamble:

> I assume the General Assembly will continue to hold to the position that it had taken since 1925 that it had constitutional power to prescribe the way that the budget will be administered. This has not been challenged for fifty years and is not likely to be challenged soon I would think. I conceded [Sanders'] point by omitting the language "in such manner as the General Assembly may prescribe." I do not believe leaving it out will change the present constitutional situation, and putting it in would add weight to one side of the argument."

Five days later, the Committee substitute for the amendment was adopted, excluding the language "in such manner as the General

Assembly may prescribe." This memorandum serves to refute the majority assertion that "supporting cases" decided prior to the "enactment of present article III, section 5 . . . inform our decision here because they represent *settled law* as to the understanding of the legislative power under this State's Constitution with regard to [the General Assembly's] power to appropriate and the duty of the Governor to execute the laws." (Emphasis added).

The proposed amendment ultimately adopted by the General Assembly and ratified by the voters was purposefully left noncommittal on the question of the General Assembly's authority to participate in the administration of budgets it had enacted. Ferrell's assumption that the issue would remain unchallenged proved to be incorrect, however, as our Supreme Court in *Wallace* and other opinions did address this question shortly after the ratification of the amendment of Article III, Section 5(3), which began both the judicial and legislative process of more clearly defining the role of the General Assembly with respect to powers granted by our Constitution to the executive branch. *See Ivarsson,* 156 N.C. App. at 631-32, 577 S.E.2d at 652-53.

Whatever the intent of the General Assembly in drafting and approving the language to the amendment of Article III, Section 5(3), the General Assembly did continue to directly participate in varying degrees with the administration of the budgets it had enacted, which participation was later deemed *unconstitutional* by our Supreme Court. *Wallace,* 304 N.C. at 608-09, 286 S.E.2d at 89; *In re Separation of Powers,* 305 N.C. at 776-77, 295 S.E.2d at 594; *see also Ivarsson,* 156 N.C. App. at 631-32, 577 S.E.2d at 652-53. Our Court should not conduct an analysis of the General Assembly's intent in drafting the amendment of Article III, Section 5(3) based upon this erroneous understanding of the powers of the legislative branch, and acts by the General Assembly later held to be unconstitutional.

> At the threshold of our consideration of the questions here presented we note the well-recognized rule that where a statute or ordinance is susceptible to two interpretations—one constitutional and one unconstitutional—the Court should adopt the interpretation resulting in a finding of constitutionality. *State v. Frinks,* 284 N.C. 472, 201 S.E.2d 858 (1974); *Randleman v. Hinshaw,* 267 N.C. 136, 147 S.E.2d 902 (1966); *Finance Co. v. Leonard,* 263 N.C. 167, 139 S.E.2d 356 (1964).

*Smith v. Keator,* 285 N.C. 530, 534, 206 S.E.2d 203, 206 (1974).

Even assuming *arguendo* that the intent of the General Assembly and the people of North Carolina in proposing and ratifying the amendment to Article III, Section 5(3) in the manner suggested by the majority could be determined, because I believe the majority's interpretation would lead to an unconstitutional violation of the separation of powers doctrine, we must interpret this amendment in a manner not violative of our Constitution if such an interpretation is possible. *Id.* Such an interpretation is possible and, in fact, more in line with the clear intent behind the amendment when read as a whole, and *in pari materia* with the other provisions of our Constitution. *Preston,* 325 N.C. at 449, 385 S.E.2d at 478.

## VII.

It is clear from the plain language of Article III, Section 5(3) that the purpose of the amendment is to grant the Governor the power to administer the budget to prevent a budgetary deficit. Budgetary crises may present themselves in a myriad of forms. If the Governor believes a deficit is pending but is not immediate, the Governor may decide that working with the General Assembly (*i.e.* proposing budgetary legislation for the General Assembly to debate and potentially enact) is the best option. When, however, the Governor anticipates an immediate budget crisis and deficit, the restrictions on executive action as mandated by the majority are inefficient, impractical, and likely to thwart the Governor in the Governor's constitutional duty to prevent a deficit.

Our Supreme Court has held unconstitutional any system where the Governor must obtain the permission of the General Assembly (or members thereof) in carrying out the Governor's executive duties. Therefore, a result of the majority opinion may be to compel the Governor to ask the General Assembly to enact legislation to authorize reallocation of funds within a current budget. The General Assembly may refuse to act, or may disagree with the recommendation of the Governor, and pass legislation in an attempt to prevent a deficit that is wholly unrelated to the Governor's determination of what is the best path to avoid the anticipated deficit. The General Assembly may fully agree with the recommendations of the Governor, but the legislative process may take too long, and the State may incur a deficit despite the best intentions of the Governor and the General Assembly to work together. The Governor would then, even if the Governor had acted with the utmost expediency, good faith and diligence, be in violation of the constitutional mandate of Article

III, Section 5(3)—without power to perform the Governor's constitutional duties in this regard.

Under the majority opinion, the true power to "effect the necessary economies" to prevent a deficit will lie with the General Assembly pursuant to an incorrect interpretation of Article III, Section 5(3). The majority opinion would remove the Governor's ability to act quickly in a crisis to perform the Governor's constitutional duty to "effect the necessary economies" in order to prevent a deficit. It would remove the Governor's ability to make discretionary determinations in a budget crisis and then act upon them. I believe the majority's interpretation of Article III, Section 5(3) runs contrary to the plain language of that amendment, its "dominant purpose" and "spirit" when read *in pari materia* with other relevant constitutional provisions, *Stancil*, 237 N.C. at 444, 75 S.E.2d at 514; *see also Preston*, 325 N.C. at 449, 385 S.E.2d at 478, and will result in severe limitations on the Governor's authority and power to "effect the necessary economies" to fulfil the Governor's constitutional duty to prevent a deficit.